# 22-2760

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

YOUT LLC,

*Plaintiff-Appellant,*

—against—

RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,
DOE RECORD COMPANIES, 1-10,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR *AMICUS CURIAE* GITHUB, INC.
## IN SUPPORT OF NEITHER PARTY

JEFFREY A. LAMKEN
ROBERT K. KRY
FU SHEK ROCKY LI
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 556-2000

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* GitHub, Inc. certifies that its parent corporation is Microsoft Corporation, and that no other publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF *AMICUS CURIAE* ........................................................................1

ARGUMENT .........................................................................................................3

I.    The District Court's Reasoning Defies the Plain Terms of the DMCA..........4

II.   The District Court's Reasoning Threatens a Wide Range of Beneficial
      Software Tools...................................................................................7

CONCLUSION ...................................................................................................14

# <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Agfa Monotype Corp. v. Adobe Sys., Inc.*,
    404 F. Supp. 2d 1030 (N.D. Ill. 2005) .................................................6

*Digital Drilling Data Sys., LLC v. Petrolink Servs., Inc.*,
    965 F.3d 365 (5th Cir. 2020) ...............................................5

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) .......................................................7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ...............................................5

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010) ...............................................5

*United States v. Santos*,
    553 U.S. 507 (2008)......................................................7

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ...............................................6

*Valve Corp. v. Ironburg Inventions Ltd.*,
    8 F.4th 1364 (Fed. Cir. 2021) ............................................12

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
    No. 3:20-cv-1602, 2022 WL 4599203 (D. Conn. Sept. 30, 2022) ..................3, 6

### STATUTES

17 U.S.C. § 101 .........................................................6

17 U.S.C. § 1201(a) ................................................*passim*

17 U.S.C. § 1201(a)(3) .................................................4

17 U.S.C. § 1204(a)..................................................3, 6

## LEGISLATIVE MATERIALS

H.R. Rep. No. 105-551, pt. 2 (1998) ........................................................4

## OTHER AUTHORITIES

Adblock Plus, *About Adblock Plus*, adblockplus.org/en/about ................................9

AudioEye, *How Screen Readers Make Digital Content Accessible*,
    AudioEye Blog (Apr. 5, 2019), www.audioeye.com/post/what-is-a-
    screen-reader ........................................................................................9

Dark Reader Ltd., *Dark Reader: Dark Mode Everywhere*,
    darkreader.org .................................................................................7, 8

Google, *Chrome Web Store: Extensions*, chrome.google.com/
    webstore/category/extensions ................................................................7

Google, *Google Translate*, chrome.google.com/webstore/detail/
    google-translate/aapbdbdomjkkjkaonfhkkikfgjllcleb .............................8

Alex Hern, *Major Sites Including New York Times and BBC Hit
    by "Ransomware" Malvertising*, Guardian (Mar. 16, 2016),
    www.theguardian.com/technology/2016/mar/16/major-sites-new-
    york-times-bbc-ransomware-malvertising ...........................................10

Internet Archive, *About the Internet Archive*, archive.org/about ...........................12

Thorin Klosowski, *Our Favorite Ad Blockers and Browser
    Extensions To Protect Privacy*, N.Y. Times (Jan. 10, 2023),
    www.nytimes.com/wirecutter/reviews/our-favorite-ad-blockers-
    and-browser-extensions-to-protect-privacy .........................................10

Theresa Larkin, *Zoom's Auto-Generated Captions Available to All
    Free Users*, Zoom Blog (Oct. 25, 2021), blog.zoom.us/zoom-auto-
    generated-captions .................................................................................9

MakeUseOf.com, *How To Disable Text Selection, Cut, Copy, Paste,
    and Right-Click on a Web Page*, www.makeuseof.com/disable-
    text-selection-cut-copy-paste-right-click-on-web-page........................12

Microsoft, *How Bing Delivers Search Results*,
support.microsoft.com/en-us/topic/how-bing-delivers-search-
results-d18fc815-ac37-4723-bc67-9229ce3eb6a3 ...............................................12

Microsoft, *Microsoft Extensions Collection*,
microsoft.com/en-us/bing/browser-extensions ....................................................7

*OpenDyslexic: A Typeface for Dyslexia*, opendyslexic.org.......................................8

PrintFriendly, printfriendly.com ................................................................................8

uBlock Origin, *uBlock Origin – Free, Open-Source Ad Content
Blocker*, ublockorigin.com...................................................................................9

VideoLAN, *VLC Media Player*, videolan.org/vlc ...................................................11

VLC User Documentation, *Tips & Tricks: Jigsaw Puzzle*,
docs.videolan.me/vlc-user/3.0/en/basic/
tipsandtricks#jigsaw-puzzle ..................................................................................11

VLCHelp, *How To Edit Video, Apply Effects & Filters and Save Them
Permanently in VLC*, www.vlchelp.com/edit-video-apply-effects-
filters-save-permanently-vlc ..................................................................................11

VLCHelp, *How To Play YouTube Videos in VLC Media Player*,
www.vlchelp.com/play-youtube-videos-vlc-media-player ..................................11

Abby Vollmer, *Standing Up for Developers: Youtube-dl Is Back*,
GitHub Blog (Nov. 16, 2020), github.blog/2020-11-16-standing-
up-for-developers-youtube-dl-is-back ..................................................................13

## INTEREST OF *AMICUS CURIAE*[1]

GitHub, Inc. runs the world's largest online software development platform, enabling more than 100 million developers, students, startups, small businesses, large companies, NGOs, and governments to host and collaborate on software projects. Much of that software is open source — freely available for anyone to use, study, modify, or distribute for any purpose.

GitHub's tools and services make it easier for developers to be developers: to collaborate, to solve challenging problems, to build on one another's work, and to create the world's most important technologies. Software developers routinely take things apart, figure out how they work, and rebuild them in new and creative ways. The law should encourage that developer curiosity, which is central to innovation and yields some of the world's most useful open source software. That software includes things such as screen readers, video editors, web archivers, and ad blockers — applications that are critical to the usability, accessibility, and preservation of the internet.

Consistent with its mission to be the home for all developers, GitHub has a strong interest in advocating for clear legal rules that support software innovation

---

[1] All parties have consented to the filing of this brief. *Amicus* certifies that no counsel for either party authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no one other than *amicus* contributed money intended to fund the preparation or submission of the brief.

and do not imperil conduct widely considered to be permissible and beneficial. The district court's reasoning is inconsistent with those principles. It leaves developers with inadequate guidance and threatens the collaborative environment on which technological progress depends.

The Digital Millennium Copyright Act ("DMCA") makes it unlawful to "circumvent a technological measure that effectively controls access" to a copyrighted work. 17 U.S.C. § 1201(a). YouTube makes its videos freely accessible to everyone over the internet by means of a uniform resource locator ("URL") address that anyone can access through a web browser or any number of other conventional programs. According to the district court, however, YouTube's decision not to include a "download" option in its own interface constitutes an "access control" that prohibits anyone else from adding that additional means of experiencing the same publicly available content.

GitHub takes no position on the ultimate resolution of this appeal on the facts pled by Yout. But the district court's expansive interpretation of the DMCA's anti-circumvention provision compels GitHub to point out how the court's rationale needlessly threatens countless other software tools in widespread use. Developers routinely design software that allows users to experience content in new and value-enhancing ways without express permission from a copyright owner. By interpreting the DMCA in a way that conflates measures controlling

2

*access* to a work with measures controlling *use* of a work that is already publicly accessible, the district court's ruling threatens to imperil the software developers who create those tools, ensnaring legitimate software within the DMCA's reach and chilling technological innovation. The Court should reject the district court's flawed interpretation.

## ARGUMENT

The DMCA makes it unlawful to "circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a). Violations can result in criminal penalties, including fines and prison sentences. *Id.* § 1204(a). The district court adopted an expansive interpretation of that provision that threatens numerous programming tools in widespread use.

YouTube makes its video and audio content freely available to everyone over the internet. In the district court's view, however, because YouTube's own user interface does not include a "download" button, and because an "ordinary user . . . in the ordinary course" would not download the videos, Yout violates the DMCA by enabling users to download YouTube's publicly available videos. *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, No. 3:20-cv-1602, 2022 WL 4599203, at \*13 (D. Conn. Sept. 30, 2022).

That reasoning cannot be sustained. A software tool does not violate the DMCA's anti-circumvention provision simply because it allows users to

3

experience content differently once the publisher makes its content available to the public.  The district court's holding ignores settled legal principles and casts doubt on a broad array of beneficial and widely adopted software tools.

## I.  THE DISTRICT COURT'S REASONING DEFIES THE PLAIN TERMS OF THE DMCA

The DMCA states in Section 1201(a) that "[n]o person shall circumvent a technological measure that effectively controls *access* to a work protected under this title."  17 U.S.C. § 1201(a) (emphasis added).  By its plain terms, that anti-circumvention provision addresses only measures that control *access* to content, not efforts to control how a person *experiences* content once the provider makes it publicly accessible.  That is true even if an "ordinary user . . . in the ordinary course" would experience the content in one particular way.

Other provisions confirm that focus.  The DMCA defines circumvention to include, among other things, "descrambl[ing] a scrambled work" or "decrypt[ing] an encrypted work" — both examples of obtaining *access* to content that is otherwise inaccessible.  17 U.S.C. § 1201(a)(3).  The legislative history explains that "measures that can be deemed to 'effectively control access to a work' would be those based on encryption, scrambling, authentication, or some other measure which requires the use of a 'key' provided by a copyright owner to *gain access to a work*."  H.R. Rep. No. 105-551, pt. 2, at 39 (1998) (emphasis added).

Courts have thus repeatedly held that Section 1201(a) applies only to restrictions on **access** to works. In *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), for example, a printer manufacturer equipped its printers with microchips designed to prevent their use with competitors' toner cartridges, and a competitor sold microchips that defeated those protections. The Sixth Circuit held that there was no DMCA violation because the manufacturer's technological measures merely restricted how consumers **used** its printers, not access to the copyrighted software code itself: Although the measures "may well block . . . the 'ability to . . . make use of' the [software] by preventing the printer from functioning," "[a]nyone who buys a Lexmark printer may read the literal code of the [software] directly from the printer memory." *Id.* at 546-47.

Similarly, in *Digital Drilling Data Systems, LLC v. Petrolink Services, Inc.*, 965 F.3d 365 (5th Cir. 2020), the Fifth Circuit held that a company did not violate the DMCA by bypassing a competitor's interface to access its copyrighted database schema. While the "Interface Process may have effectively restricted certain unauthorized **uses** of the DataLogger software . . . these security measures did not effectively control and indeed were not designed to control **access** to the protected database schema" itself, which "was stored in an open database file." *Id.* at 376 (emphasis added); *see also MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d

928, 952 (9th Cir. 2010) (no violation where software was "available on a player's hard drive once the game client software is installed"); *Agfa Monotype Corp. v. Adobe Sys., Inc.*, 404 F. Supp. 2d 1030, 1035-37 (N.D. Ill. 2005) (similar).  In short, "the DMCA targets the **circumvention** of digital walls guarding copyrighted material . . . , but does not concern itself with the **use** of those materials." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001).

The district court's rationale ignores those principles.  The court nowhere disputed that the videos consumers access through Yout's website are the same ones they can access directly through YouTube's own interface — in other words, the same "works."  17 U.S.C. § 1201(a); *see id.* § 101 (defining "[a]udiovisual works").  The court found a DMCA violation merely because Yout allows users to experience those works differently from how an "ordinary user . . . in the ordinary course" experiences them on YouTube — by downloading rather than streaming them.  *Yout*, 2022 WL 4599203, at *10, *13.  YouTube's decision not to provide its own "download" button, however, is not a restriction on **access** to works.  It merely affects **how users experience** them.

The district court's expansive interpretation is particularly alarming because, unlike most copyright provisions, the DMCA imposes criminal penalties.  *See* 17 U.S.C. § 1204(a) (authorizing fines up to $500,000 and five years' imprisonment for first offenses).  Those penalties require that ambiguities in the statute be

resolved in favor of a narrower construction. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (rule of lenity requires narrow construction even in civil cases where statute has "both criminal and noncriminal applications"); *United States v. Santos*, 553 U.S. 507, 523 (2008) (plurality) (similar). At a minimum, those penalties underscore the importance of rejecting a construction that sweeps in a broad range of widely accepted conduct.

## II.  THE DISTRICT COURT'S REASONING THREATENS A WIDE RANGE OF BENEFICIAL SOFTWARE TOOLS

The district court's flawed reasoning would subject a broad range of commonly accepted applications and programming tools to potential liability.

Browser Extensions.  Many web browsers allow users to install "extensions" that affect how users experience webpages by changing the way the pages appear. *See, e.g.*, Microsoft, *Microsoft Extensions Collection*, microsoft.com/en-us/bing/browser-extensions; Google, *Chrome Web Store: Extensions*, chrome.google.com/webstore/category/extensions.  Many of those extensions are wildly popular and used by millions of people worldwide.  But the district court's reasoning threatens even the most innocuous and widely adopted examples.

Dark Reader, for example, is an "open source eye-care browser extension" with more than five million users.  *See* Dark Reader Ltd., *Dark Reader: Dark Mode Everywhere*, darkreader.org.  It automatically replaces a website's color scheme with an alternative scheme less straining on the eyes — substituting, for

7

example, white-on-black text for black-on-white text. *Id.* Dark Reader only enables access to content that website publishers have already chosen to make accessible, and users load that content from the same place. But Dark Reader enables users to experience the content differently from how an "ordinary user" does by presenting the content in a different way. The New York Times website, for example, does not have its own "dark mode" button. Yet Dark Reader enables consumers to view the website in dark mode nonetheless. On the district court's flawed reasoning, Dark Reader would be "circumventing" the publisher's website design decision not to include its own dark mode.

Other examples abound. The Google Translate browser extension, with over ten million users, allows viewers to translate webpages into other languages. *See* Google, *Google Translate*, chrome.google.com/webstore/detail/google-translate/aapbdbdomjkkjkaonfhkkikfgjllcleb. The OpenDyslexic extension replaces webpage fonts with a specialized font more easily read by people with dyslexia. *See OpenDyslexic: A Typeface for Dyslexia*, opendyslexic.org. The PrintFriendly extension rearranges webpage layouts to make them print better. *See* PrintFriendly, printfriendly.com. None of those extensions circumvents restrictions on ***access*** to content. But they all enable users to experience the same content loaded from the same place in a manner different from how an ordinary user experiences the content.

Screen Readers.  Other applications make it easier for individuals with disabilities to experience web content.  Screen readers, for example, "enable[] those who cannot see the screen to access information on computers and smartphones." AudioEye, *How Screen Readers Make Digital Content Accessible*, AudioEye Blog (Apr. 5, 2019), www.audioeye.com/post/what-is-a-screen-reader.  "The technology literally reads the screen aloud or converts it to Braille." *Id.*  "Screen readers have been around nearly as long as the World Wide Web." *Id.*  Conversely, other technologies convert audio to written text, enabling people with hearing disabilities to understand spoken dialogue by automatically generating captions. *Cf.* Theresa Larkin, *Zoom's Auto-Generated Captions Available to All Free Users*, Zoom Blog (Oct. 25, 2021), blog.zoom.us/zoom-auto-generated-captions.

Screen readers and automated captioning programs only provide access to works a publisher has chosen to make accessible.  But under the district court's flawed theory, they too could be circumventing access controls by enabling users to experience content in a manner different from how an ordinary user does.

Ad Blockers.  Many third parties have developed ad blocker browser extensions that disable those annoying pop-up ads as well as the "cookies" that advertisers use to track users on the internet. *See, e.g.*, uBlock Origin, *uBlock Origin – Free, Open-Source Ad Content Blocker*, ublockorigin.com; Adblock Plus, *About Adblock Plus*, adblockplus.org/en/about.  Those ad blockers benefit users in

9

several ways. They not only eliminate distracting interruptions from webpages, but also enhance user privacy by preventing tracking and improve security by removing a well-known point of vulnerability for malware. *See* Thorin Klosowski, *Our Favorite Ad Blockers and Browser Extensions To Protect Privacy*, N.Y. Times (Jan. 10, 2023), www.nytimes.com/wirecutter/reviews/our-favorite-ad-blockers-and-browser-extensions-to-protect-privacy (ad blockers "increase privacy by decreasing your exposure to trackers" and "have the welcome side effect of boosting your security"); Alex Hern, *Major Sites Including New York Times and BBC Hit by "Ransomware" Malvertising*, Guardian (Mar. 16, 2016), www.theguardian.com/technology/2016/mar/16/major-sites-new-york-times-bbc-ransomware-malvertising (describing malware delivered through ad networks).

Ad blockers do not enable consumers to access any content the publisher has not already chosen to make available. But by stripping out ads, they permit consumers to view publicly accessible content in a manner different from how a consumer ordinarily does. On the district court's erroneous theory, the developers who offer those widely embraced applications could be criminals facing hundreds of thousands of dollars in fines or years in prison.

<u>Custom Media Players</u>.   Other third-party applications permit users to modify the way they experience video content, including YouTube videos.  While YouTube's own interface permits users to play, pause, and scroll through videos, third-party applications give users far more flexibility.

VLC Media Player, for example, is a free open source software application for playing video and audio content.  *See* VideoLAN, *VLC Media Player*, videolan.org/vlc.  VLC enables users to stream YouTube videos by entering the video's URL address into the application.  *See* VLCHelp, *How To Play YouTube Videos in VLC Media Player*, www.vlchelp.com/play-youtube-videos-vlc-media-player.  The user can then access a rich set of playback features not available through YouTube's native interface, such as fine-grained control over playback speed and filters that modify brightness or contrast.  *See id.*; VLCHelp, *How To Edit Video, Apply Effects & Filters and Save Them Permanently in VLC*, www.vlchelp.com/edit-video-apply-effects-filters-save-permanently-vlc.  Users can even play back multiple videos simultaneously to "mash up" content, or turn a video into a jigsaw puzzle.  *See* VLCHelp, *How To Play YouTube Videos in VLC Media Player*, www.vlchelp.com/play-youtube-videos-vlc-media-player; VLC User Documentation, *Tips & Tricks: Jigsaw Puzzle*, docs.videolan.me/vlc-user/3.0/en/basic/tipsandtricks#jigsaw-puzzle.

<u>Archiving</u>.  Tools that download content displayed on webpages are also critical to many web services that consumers take for granted.  Search engines, for example, collect information to enable users to distill the vast expanse of information on the internet.  Search engines "crawl" the web to build an index of content to display in response to user queries.  *See* Microsoft, *How Bing Delivers Search Results*, support.microsoft.com/en-us/topic/how-bing-delivers-search-results-d18fc815-ac37-4723-bc67-9229ce3eb6a3.

The Internet Archive's Wayback Machine is another example.  That project began archiving the internet in 1996 and is now a digital library with over 735 billion webpages.  *See* Internet Archive, *About the Internet Archive*, archive.org/about.  Countless researchers have relied on the Wayback Machine to retrieve information that would otherwise have been lost.  Courts themselves take judicial notice of its archived webpages as records "whose accuracy cannot reasonably be questioned." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374-75 (Fed. Cir. 2021).

Website publishers who display information on their webpages do not typically invite users to download copies.  Indeed, some webpages affirmatively try to disable user copying.  *See, e.g.*, MakeUseOf.com, *How To Disable Text Selection, Cut, Copy, Paste, and Right-Click on a Web Page*, www.makeuse of.com/disable-text-selection-cut-copy-paste-right-click-on-web-page.   Under the

district court's flawed analysis, services that nonetheless sought to archive those materials would be violating federal law.[2]

\* \* \* \* \*

The district court's rationale thus imperils wide swaths of conduct that the software development community considers both acceptable and desirable. The Court should not interpret the DMCA, and its harsh criminal penalties, in a way that threatens those beneficial activities.

---

[2] The youtube-dl open source software that Yout apparently relies on is also commonly used for archival purposes, such as "preserving evidence in the fight for human rights." Abby Vollmer, *Standing Up for Developers: Youtube-dl Is Back*, GitHub Blog (Nov. 16, 2020), github.blog/2020-11-16-standing-up-for-developers-youtube-dl-is-back. Like VLC Media Player, youtube-dl helps users experience the same publicly available content in other ways. *Id.*

## <u>CONCLUSION</u>

The Court should reject the district court's erroneous reasoning to the extent inconsistent with the principles above.

February 9, 2023     Respectfully submitted,

              _/s/ Robert K. Kry_____
              Jeffrey A. Lamken
              Robert K. Kry
              Fu Shek Rocky Li
              MOLOLAMKEN LLP
              The Watergate, Suite 500
              600 New Hampshire Avenue, N.W.
              Washington, D.C.  20037
              (202) 556-2000

              *Attorneys for Amicus Curiae GitHub, Inc.*

## **CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Local Rule 29.1(c) because:

 X    this brief contains 2,692 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), or

\_\_\_\_    this brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).


2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

 X    this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font, or

\_\_\_\_    this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].


    /s/ Robert K. Kry
    Robert K. Kry