# 22-2760

IN THE

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

---

YOUT LLC,

*Plaintiff-Appellant,*

—against—

RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,
DOE RECORD COMPANIES, 1-10,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)
CASE NO. 20-CV-1602 (SRU) (RAR)

---

**BRIEF FOR *AMICUS CURIAE* COPYRIGHT ALLIANCE
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

Robert H. Rotstein
Eleanor M. Lackman
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
Telephone: (310) 312-2000
Email: rxr@msk.com

Counsel for *Amicus Curiae* Copyright Alliance

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Copyright Alliance ("*Amicus*") states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of *Amicus*'s stock.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF *AMICUS CURIAE*........................................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 2

ARGUMENT ......................................................................................................... 5

I.   SECTION 1201 ENCOURAGES THE CREATION AND
     DISSEMINATION OF EXPRESSIVE WORKS .......................................... 5

II.  IN DISMISSING THE COMPLAINT, THE DISTRICT COURT
     PROPERLY REJECTED LONG-DISCREDITED ARGUMENTS ........... 13

     A.   As A Matter of Law and Policy, Copyright Holders May Rely on
          Imperfect Technical Protection Measures that Third Parties
          Provide................................................................................................ 14

     B.   Yout and Its *Amici* Persist in Raising Arguments Rejected by
          Courts .................................................................................................. 15

CONCLUSION ..................................................................................................... 20

CERTIFICATE OF COMPLIANCE.................................................................... 21

CERTIFICATE OF SERVICE ............................................................................. 22

**TABLE OF AUTHORITIES**

Page(s)

CASES

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
307 F. Supp. 2d 1085 (N.D. Cal. 2004)......................................................15, 17

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ....................................................................15, 16

*Golan v. Holder*,
565 U.S. 302 (2012)...........................................................................................2

*Green v. United States Department of Justice*,
54 F.4th 738 (D.C. Cir. 2022)...........................................................................5, 17

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985).....................................................................................1, 2, 5

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)...........................................................................................6

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).....................................................................................17, 18

*Turner Broadcasting System, Inc. v. FCC*,
512 U. S. 622 (1994) (*Turner I*) .......................................................................18

*Turner Broadcasting System, Inc. v. FCC*,
520 U.S. 180 (1997) (*Turner II*) .......................................................................19

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975)...........................................................................................5

*UMG Recordings, Inc. v. Kurbanov*,
963 F.3d 344 (4th Cir. 2020) .............................................................................13

*United States v. Elcom Ltd.*,
203 F. Supp. 2d 1111 (N.D. Cal. 2002)............................................................17

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) .............................................................2, 14, 15, 17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Universal City Studios, Inc. v. Reimerdes*,
111 F. Supp. 2d 294 (S.D.N.Y. 2000) ....................................................2, 14, 15

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
2022 WL 4599203 (D. Conn. Sept. 30, 2022)....................................................13

**STATUTES**

17 U.S.C.
§ 107............................................................................................................16
§ 1203(a) .....................................................................................................14

World Intellectual Property Organization, WIPO Copyright Treaty
(Dec. 20, 1996) ...........................................................................................6

World Intellectual Property Organization, WIPO Performances and
Phonograms Treaty (Dec. 20, 1996)....................................................................6

**OTHER AUTHORITIES**

Association of American Publishers, *Advancing Digital Platforms to
Support Student Success* (Mar. 5, 2018), https://publishers.org/our-
markets/higher-education..................................................................................12

Entertainment Software Association, *2021 Essential Facts About the
Computer and Video Game Industry* (2021),
https://www.theesa.com/2021-essential-facts-about-the-video-
game-industry ................................................................................................11

H.R. Rep. No. 105-551 .........................................................................................8

*Hearing before the Subcomm. on Courts, Intellectual Property and
the Internet of the H. Comm. On the Judiciary,* 113th Cong., 2d
Sess. (Sept. 17, 2014),
https://docs.house.gov/meetings/JU/JU03/20140917/102670/HHR
G-113-JU03-Transcript-20140917.pdf.........................................................9, 10

*Hearing Before the Subcomm. on Intellectual Property, Committee on
the Judiciary United States Senate*, Sept. 16, 2020, *Are Reforms to
Section 1201 Needed and Warranted,*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

https://www.judiciary.senate.gov/committee-activity/hearings/are-reforms-to-section-1201-needed-and-warranted ................................................10

*Library of Cong., The U.S. Copyright Office Public Roundtable on Section 1201* (May 19, 2016), https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-19-2016.pdf ................................................11

*Library of Cong., The U.S. Copyright Office Public Roundtable on Section 1201* (May 25, 2016), https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-25-2016.pdf ................................................11

*Library of Cong., U.S. Copyright Office, § 1201 Roundtable* (Apr. 12, 2018), https://www.copyright.gov/1201/2018/hearing-transcripts/1201-Rulemaking-Public-Roundtable-04-12-2018.pdf .....................8

Motion Picture Association, THEME REPORT (2021), https://www.motionpictures.org/wp-content/uploads/2022/03/MPA-2021-THEME-Report-FINAL.pdf ...................11

R. Stoner and J. Dutra, *Copyright Industries In The U.S. Economy: The 2022* Report (Dec. 2022), https://www.iipa.org/files/uploads/2022/12/IIPA-Report-2022_Interactive_12-12-2022-1.pdf .......................................................4

Recording Industry Association of America, *2021 Year-End Music Industry Revenue Report | RIAA*, https://www.riaa.com/reports/2021-year-end-music-industry-revenue-report-riaa/ .............................12

S. REP. NO. 105-190 (1998) ..........................................................6

S. Treaty Doc. No. 105-17 (1997) ...........................................6

U.S. Chamber Of Commerce, *Impacts Of Digital Piracy On the U.S. Economy* (June 2019), https://www.theglobalipcenter.com/wp-loads/2019/06/Digital-Video-Piracy.pdf ..........................................5

v

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Copyright Office, Library of Cong., *DMCA § 1201(a)(1)
Hearing*, written statement of Dean Marks, Senior Counsel,
Intellectual Property, Time Warner, at 2 (May 18-19, 2000),
https://www.copyright.gov/1201/hearings/2000/dean_marks.pdf ......................8

*U.S. Copyright Office, Library of Cong., Section 1201 of Title 17: A
Report of the Register of Copyrights* (June 2017), 80 Fed. Reg.
81372...............................................................................................................10

*U.S. Copyright Office, Library of Cong., § 1201 Rulemaking Hearing
before the Copyright Office Panel*, at 18 (May 17, 2012),
https://www.copyright.gov/1201/2012/hearings/transcripts/hearing
-05-17-2012.pdf ...............................................................................................9

U.S. Copyright Office, *Section 1201 Rulemaking: Sixth Triennial
Proceeding to Determine Exemptions to the Prohibition on
Circumvention: Recommendation of the Register of Copyrights*
107-126 (Oct. 2015)........................................................................................16

U.S. Copyright Office, *Section 512 of Title 17*, *A Report of the
Register of Copyrights* (May 2020) ................................................................12

U.S. Dep't of Justice, *Public voice and principal salesperson for
notorious videogame piracy group sentenced to 3+ years in prison
for conspiracy* (Feb. 10, 2022), https://www.justice.gov/usao-
wdwa/pr/public-voice- and-principal-salesperson-notorious-
videogame-piracy-group-sentenced-3 ...............................................................4

*WIPO Copyright Treaties Implementation Act and Online Copyright
Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280
before the Subcomm. on Courts and Intellectual Property of the H.
Comm. on the Judiciary*, 105th Cong., 1st Sess. (Sept. 16 and 17,
1997) ...................................................................................................................7

# INTEREST OF *AMICUS CURIAE*[1]

The United States Supreme Court recognizes that "the Framers intended copyright itself to be the engine of free expression." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985). Consistent with that crucial societal objective, *Amicus* the Copyright Alliance is dedicated to promoting and protecting the ability of creative professionals to earn a living from their creativity. The Alliance is a nonprofit, nonpartisan 501(c)(4) public interest and educational organization and represents the copyright interests of over two million individual creators and over 15,000 organizations across the entire spectrum of creative industries, including authors, songwriters, musical composers and recording artists, graphic and visual artists, photographers, journalists, documentarians, screen, television and filmmakers, and software developers. The Copyright Alliance's membership comprises these individual creators and innovators, creative union workers, and small businesses in the creative industry, as well as the organizations and corporations that support and invest in them. The livelihoods of this diverse array of creators and companies depend on the commercialization of the exclusive rights guaranteed by copyright law. This, in turn, incentivizes the creation of new

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No party, counsel to any party, or any person other than *Amicus* contributed money to fund preparation or submission of this brief.

works and promotes the progress of the arts.

*Amicus* submits this brief in support of Defendant/Appellee Recording Industry Association of America, Inc. ("RIAA") because reversing the district court's orders would eviscerate critical safeguards that Section 1201 provides, and would thus undermine copyright's goal to disseminate expressive works in the interests of free expression. *See Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 330 (S.D.N.Y. 2000) (*citing Harper & Row*, 471 U.S. at 558), *aff'd sub nom.*, *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

## SUMMARY OF ARGUMENT

In its well-reasoned order dismissing the complaint, the district court correctly held that Plaintiff/Appellant Yout LLC's ("Yout") stream-ripping service violates the anti-trafficking provisions of Section 1201. Yout's erroneous interpretation of Section 1201, if adopted, would thwart Congress's intended purposes and would harm and undermine popular methods of disseminating the speech of copyright owners like *Amicus*'s members.

The Copyright Clause, Art. I, § 8, cl. 8, exists to foster the creation and dissemination of original works for the general public welfare. Copyright serves as an "engine of free expression," *Harper & Row*, 471 U.S. at 558, working in tandem with the First Amendment. This salutary purpose depends on ensuring that copyright holders receive a fair return for exploiting their copyrighted works. *Golan*

*v. Holder*, 565 U.S. 302, 326 (2012) ("Evidence from the founding, moreover, suggests that inducing *dissemination*—as opposed to creation—was viewed as an appropriate means to promote science.") (emphasis in original).  In our digital age, once a single pirate makes a copy or stream of a copyrighted work available on the internet, it is extremely difficult (if not impossible) to remove before millions (or even billions) of people access the infringed work without cost.

Massive infringement impedes free expression in several ways.  Deprived of a fair return, copyright owners have less incentive to create and to disseminate expressive works, especially in digital formats.  Moreover, the specter of rampant piracy inhibits copyright holders from creating or partnering with new platforms and services that can offer the consuming public broader access to creative works.  Widespread infringement also increases the copyright owner's cost of disseminating expressive works, making access to those works more difficult for many cost-conscious consumers.  In the quarter century since the DMCA's enactment, the free-speech benefits resulting from Section 1201's deterrence of digital infringement and unauthorized access have been legion.  In challenging the district court's well-reasoned decision, Yout and its supporting *amici* ignore copyright's unique role in fostering the dissemination of creative content for the public's benefit.

As Congress envisioned when passing the Digital Millennium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (1998), 17 U.S.C. § 1201's

prohibitions against circumvention of access controls and trafficking in circumvention tools and services play a vital role in furthering copyright's crucial objectives. Section 1201 helps prevent piracy and unauthorized access to copyrighted works by preserving the incentive for content creators and distributors like the Copyright Alliance's wide array of members to embrace digital opportunities while continuing to create and disseminate expressive works.[2] In this way, the statute enables copyright owners to design innovative business models that benefit consumers by enabling lower-cost access to a more diverse variety of offerings, including subscription-based access to high-quality, digital entertainment content, on-demand viewing, cloud-based storage and sharing, and secure, authenticated videogame play. Indeed, the businesses of *Amicus*'s members directly depend upon the types of technological protection measures for which Section 1201 provides protection.[3]

---

[2] For a recent example that highlights the importance of the Section 1201 anti-circumvention provisions, *see* U.S. Dep't of Justice, *Public voice and principal salesperson for notorious videogame piracy group sentenced to 3+ years in prison for conspiracy* (Feb. 10, 2022), https://www.justice.gov/usao-wdwa/pr/public-voice- and-principal-salesperson-notorious-videogame-piracy-group-sentenced-3 (strong anti-piracy victory by DOJ against notorious hackers of video games).

[3] A recent study concluded that the copyright industries contributed over $2.9 trillion to the U.S. economy in 2021. Robert Stoner and Jéssica Dutra, Secretariat Economists, Prepared for The International Intellectual Property Alliance (IIPA), *Copyright Industries In The U.S. Economy: The 2022* Report, at 13 (Dec. 2022), https://www.iipa.org/files/uploads/2022/12/IIPA-Report-2022_Interactive_12-12-2022-1.pdf Another study concluded that global online piracy of motion pictures

The "fair use" and related "policy" arguments that Yout and its *amici* proffer are, as detailed in Appellees' brief, inconsistent with the plain language of the statute and do nothing more than repeat well-worn, erroneous arguments that the courts consistently reject—one court as recently as last December. *Green v. United States Department of Justice*, 54 F.4th 738 (D.C. Cir. 2022). As these courts recognize, the proposed limitations of Section 1201 would hinder, not further, the goal of disseminating expressive speech. The district court properly dismissed Yout's complaint.

## ARGUMENT

## I. SECTION 1201 ENCOURAGES THE CREATION AND DISSEMINATION OF EXPRESSIVE WORKS

"By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row*, 471 U.S. at 558, *citing Mazer v. Stein*, 347 U.S. 201, 209 (1954) (Copyright posits that "encouragement of individual effort by personal gain is the best way to advance public welfare"); *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) (The ultimate aim of copyright is "to stimulate [the creation of useful works] for the general public good.") (internal quotations omitted).

---

alone costs the U.S. economy at least $29.2 billion in lost revenue each year. U.S. Chamber Of Commerce, *Impacts Of Digital Piracy On the U.S. Economy*, at ii (June 2019), https://www.theglobalipcenter.com/wp- loads/2019/06/Digital-Video-Piracy.pdf.

The advent of the internet and the ability to make unauthorized perfect, digital reproductions for distribution, public performances, and public displays of copyrighted works on a massive scale posed an enormous threat to copyright holders who otherwise desired to innovate and explore new media and new distribution models. After a lengthy legislative process, Congress concluded that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." *See* S. REP. NO. 105-190, at 8 (1998).[4] The United States enacted Section 1201 for very good reasons. The Nation had just joined the World Intellectual Property Organization ("WIPO") Copyright Treaty ("WCT") and the WIPO Performances and Phonograms Treaty ("WPPT"), Apr. 12, 1997, S. Treaty Doc. No. 105-17, 5 (1997), which required parties to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors [or "performers or producers of phonograms"] in connection with the exercise of their rights… ." WIPO, art. 11 (Dec. 20, 1996); WPPT, art. 18 (Dec. 20, 1996). When Congress held hearings regarding implementation of the treaties,

---

[4] With the advent of file-sharing software, Congress's concern about the effects of massive infringement proved prescient. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005) ("[B]ecause well over 100 million copies of the software in question are known to have been downloaded, and billions of files are shared across the FastTrack and Gnutella networks each month, ***the probable scope of copyright infringement is staggering***.") (emphasis added).

copyright owners, and the Clinton Administration strongly supported legislation creating a right against unauthorized access and protecting against trafficking in circumvention devices and services. After hearing from the administration, copyright owners, and opponents of the legislation, Congress emphasized the role that such legislation would play in helping to launch new business models for disseminating creative expression.[5]

Consequently, the Congressional Record contained substantial evidence that statutory prohibitions against unauthorized access and circumvention tools and services were an essential supplement to existing law to protect copyright owners and thus not only prevent piracy, but also *incentivize online speech*. *See* Staff of the H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281

---

[5] *See*, *e.g.*, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 and H.R. 2280 before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judiciary*, 105th Cong., 1st Sess., at 79 (Sept. 16 and 17, 1997) (statement of Jack Valenti, Chief Executive Officer, Motion Picture Association of America) ("The same technology that will smooth the way for legitimate delivery of video on demand over digital networks will also prime the pump for copyright pirates."); *id.* at 204 (statement of Allan Adler, General Counsel, Association of American Publishers) ("Without adequate safeguards for copyright, the promise of the Internet simply won't be fulfilled."); 1997 WL 572471, *3-4 (Statement of Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, Bruce A. Lehman) ("Section 1201 "is intended to protect the rights of copyright owners while encouraging the continued advancement of technology in a balanced manner that takes into account the needs and concerns of all interested parties and the importance of promoting the continuing growth of electronic commerce with its benefits for all members of American society.").

as Passed by the U.S. H. of Rep. on Aug. 4, 1998, at 6 (Comm. Print 1998) ("These technological measures … that this bill protects can be deployed, not only to prevent piracy and other harmful unauthorized uses of copyrighted materials, but also to support new ways of disseminating copyrighted materials to users … These technological measures may make more works more widely available … ."). Every three years, for a period covering multiple Registers of Copyrights and multiple Librarians of Congress, copyright owners—through the "fail safe"[6] triennial rulemaking process codified in § 1201(a)(1)(C)—present new evidence regarding (i) ongoing risks presented by digital piracy and (ii) the ways in which Section 1201(a) has facilitated the launch of successful business models that have increased the availability of means of access to creative content.[7]

---

[6] H.R. Rep. No. 105-551, pt. 2, at 36 ("Given the threat of a diminution of otherwise lawful access to works and information, the Committee on Commerce believes that a 'fail-safe' mechanism is required. This mechanism would ... allow the ... [waiver of the anti-circumvention provisions], for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials."). During every triennial proceeding, *Amicus*'s members have submitted evidence to the Copyright Office concerning the innovative business models for distribution of their creative works that have been facilitated by Section 1201, and about the ongoing threat posed by digital piracy. Over the past several cycles, most copyright owners have not opposed renewal of previously granted exemptions, pursuant to a streamlined renewal process agreed to by copyright owners, exemption proponents, and Register(s).

[7] *See*, *e.g.*, U.S. Copyright Office, Library of Cong.*, DMCA § 1201(a)(1) Hearing*, written statement of Dean Marks, Senior Counsel, Intellectual Property, Time Warner, at 2 (May 18-19, 2000), https://www.copyright.gov/1201/hearings/2000/dean_marks.pdf; *Library of Cong.,*

Over the years, Congress also gathered, through hearings and other methods, additional evidence of the continued need for, and the success of, Section 1201. *See*, *e.g*., Chapter 12 of Title 17, *Hearing before the Subcomm. on Courts, Intellectual Property and the Internet of the H. Comm. On the Judiciary,* 113th Cong., 2d Sess., at 2 (Sept. 17, 2014) (statement of Rep. Jerrold Nadler) (Section 1201 "has worked to encourage the creation of new digital works and has allowed authors a way to protect against copyright infringement while also helping to promote the development of new and innovative business models."); *id*. (statement of Rep. Thomas Marino) ("The digital economy has enabled wide distribution of movies, music, eBooks and other digital content. Chapter 12 seems to have a lot to do with the economic growth . . . ."), at 3;[8] *see also Hearing Before the Subcomm. on Intellectual Property, Committee on the Judiciary United States Senate*, Sept. 16,

---

*U.S. Copyright Office, § 1201 Roundtable*, at 102 (statement of David Hughes, Chief Technology Officer Recording Industry Association of America ("RIAA")) (Apr. 12, 2018), https://www.copyright.gov/1201/2018/hearing-transcripts/1201-Rulemaking-Public-Roundtable-04-12-2018.pdf; (statement of Christian Genetski, General Counsel, Entertainment Software Association ("ESA"); *U.S. Copyright Office, Library of Cong., § 1201 Rulemaking Hearing before the Copyright Office Panel*, at 18 (May 17, 2012), https://www.copyright.gov/1201/2012/hearings/transcripts/hearing-05-17-2012.pdf; 72 (statement of Christian Genetski, General Counsel, Entertainment Software Association ("ESA"); *id.* at 72 (statement of Dan Mackechnie, Executive Vice President, 20th Century Fox Home Entertainment).

[8] The hearing transcript is available at: https://docs.house.gov/meetings/JU/JU03/20140917/102670/HHRG-113-JU03-Transcript-20140917.pdf.

2020, *Are Reforms to Section 1201 Needed and Warranted?* (Statement of Regan Smith, General Counsel and Associate Register of Copyrights) ("Over the past two decades, this provision has largely operated as originally envisioned by Congress, discouraging piracy and infringement, facilitating innovation, and providing consumers with a wide range of content delivery options at a variety of price points.").[9]

In 2017, Congress requested a report from the Register of Copyrights concerning how Section 1201 functions in the marketplace. The report confirmed that Section 1201 has successfully spurred the dissemination of creative works. *See U.S. Copyright Office, Library of Cong., Section 1201 of Title 17: A Report of the Register of Copyrights* (June 2017), 80 Fed. Reg. at 81372 ("Since the enactment of section 1201, the use of technological measures has been useful in expanding consumer choice and the avenues for dissemination of creative works …"). The report also concluded that the circulation of circumvention tools would cause increased harm to copyright owners and the public. *Id.* at 56 ("[T]he Office agrees with the commenters who argued that it would be impossible to control the downstream uses of any circumvention tools once distributed, even if they were produced with the intent that they be used only to assist authorized

---

[9] The written statement of Regan Smith is available here
https://www.judiciary.senate.gov/committee-activity/hearings/are-reforms-to-section-1201-needed-and-warranted.

circumvention.").[10]

Section 1201 allows *Amicus*'s members to transform their businesses in ways that expand the output of creative expression and make that expression more widely accessible to consumers. *Amicus's* members constantly transform approaches to meet the demands of their customers and to provide choices to keep audiences growing and diversifying.[11] For example, subscription-based, digital access to

---

[10] Like *amicus* EFF and other opponents of the statute, Copyright Alliance and its members submitted comments and testimony during the Section 1201 Study process. *See*, *e.g.*, *Library of Cong., The U.S. Copyright Office Public Roundtable on Section 1201*, at 22-23 (May 19, 2016), https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-19-2016.pdf (statement of Troy Dow, Vice President and Counsel, Walt Disney Co.) ("I can tell you that the availability of these legal tools has been directly relevant to the decisions to get into these markets … [T]he DMCA has been a factor in the willingness to engage in all of those things. And so, I think it, from our perspective, has been both necessary and successful."); *Library of Cong., The U.S. Copyright Office Public Roundtable on Section 1201*, at 35 (May 25, 2016), https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-25-2016.pdf (statement of Ben Golant, Chief Counsel for Intellectual Property Policy, ESA) ("I think that the statute has allowed members to be creative in ways to protect its content through DRM measures and then having 1201 on top of that gives them a modicum of assurance that they can go forward to create more and new things. In fact the entire system … leads not only to the creation of innovative products but also goodwill among our consumers."); *id.* at 15 (statement of Susan Chertkof, Senior Vice President for Business and Legal Affairs, RIAA) ("It's been well publicized in the music industry that the industry is shifting from an ownership model to an access model and that access is really kind of where all the growth is.").

[11] *See generally* Entertainment Software Association, *2021 Essential Facts About the Computer and Video Game Industry* (2021), https://www.theesa.com/2021-essential-facts-about-the-video-game-industry/; Motion Picture Association, THEME REPORT (2021), https://www.motionpictures.org/wp-

movies, television content, newspapers, books, magazines, music, and videogames, along with inexpensive, time-limited access to downloads of such works, would not be viable business models without legal protection for access controls. In designing their diverse offerings, authors and creative businesses need marketplace protection against widespread availability of hacking tools that render useless the limitations on digital access that make these offerings possible. Section 1201 provides that protection and serves copyright law's objective of fostering free expression.

"The technology that allows copyright owners to distribute content directly to consumers' living rooms via streaming services also enables new forms of piracy: streaming of unlicensed content and stream-ripping—that is, using software to make an unlicensed copy of streamed content that would otherwise be licensed…. *Stream-ripping in particular has been a growing problem for the music industry*." U.S. Copyright Office, *Section 512 of Title 17*, *A Report of the Register of Copyrights* (May 2020) at 31 & note 143 (emphasis added). *See* Recording Industry Association of America and National Music Publishers' Association Comments Submitted in Response to Request of the U.S. Intellectual Property Enforcement Coordinator for

---

content/uploads/2022/03/MPA-2021-THEME-Report-FINAL.pdf; Association of American Publishers, *Advancing Digital Platforms to Support Student Success* (Mar. 5, 2018), https://publishers.org/our-markets/higher-education; Recording Industry Association of America, *2021 Year-End Music Industry Revenue Report | RIAA*, https://www.riaa.com/ reports/2021-year-end-music-industry-revenue-report-riaa/.

Public Comments: Development of the Joint Strategic Plan on Intellectual Property Enforcement 5 (Nov. 13, 2018); *see also UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 349 (4th Cir. 2020) (describing the massive piracy caused by defendant's stream-ripping service). Without question, Yout's service flouts the express terms and the crucial purpose of Section 1201, all to the ultimate detriment of the consumer.

## II. IN DISMISSING THE COMPLAINT, THE DISTRICT COURT PROPERLY REJECTED LONG-DISCREDITED ARGUMENTS

Yout argues that YouTube never intended for its encryption technology to constitute an access control under the statute and that the TPM is ineffective anyway. First, as explained in Appellee's' brief, the "intent" requirement is invented from whole cloth. Second, in holding that YouTube implements an effective access and copy control, the district court applied the well-established principle that, to receive protection under Section 1201, a technical protection measure might nevertheless be vulnerable to workarounds that circumvent protection. As the district court noted: "There is a legal consensus that the fact that a person may deactivate or go around a TPM does not 'mean that the technology fails to offer effective control,' because so holding would render the DMCA 'nonsensical.'" *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 2022 WL 4599203, at *14 (D. Conn. Sept. 30, 2022), *quoting* 4 *Nimmer on Copyright* § 12A.03 (cleaned up) and citing cases. Yout's contrived attempt to show that YouTube users already have access to copyrighted works via a

convoluted, Rube Goldberg-like process actually refutes the "lack of effectiveness" argument.

Furthermore, the arguments that Yout and its *amici* present flout the statute's plain language, the policies underlying Section 1201 and the established case law in several other ways.

### A. As A Matter of Law and Policy, Copyright Holders May Rely on Imperfect Technical Protection Measures that Third Parties Provide

An important mechanism to enforce Section 1201 permits copyright owners to rely on technical protection measures that third parties like YouTube here provide. *See* 17 U.S.C. § 1203(a) ("*Any person* injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.") (emphasis added). For example, in *Reimerdes*, 111 F. Supp. 2d at 310, the plaintiff copyright owners sued defendants, who trafficked in software that circumvented CSS, an access control placed on DVDs. Significantly, the plaintiff motion picture companies did not themselves own CSS encryption and were not in the business of making DVD players and drives. Rather, the technology for making compliant devices, i.e., devices with CSS keys, "had to be licensed to consumer electronics manufacturers." *Id.* An entity called the DVD Copy Control Association ("DVD CCA"), licensed the CSS keys. *Id.* The DVD CCA, in turn, had licensed the CSS keys from the developers of the keys. *Id.* Thus, in *Corley* the plaintiff

copyright holders relied on technological measures that third parties created and licensed. *Corley*, 273 F.3d at 440–41 (describing the DMCA's purpose and anti-circumvention provisions); *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865 (9th Cir. 2017) (accord);[12] *321 Studios v. Metro Goldwyn Mayer Studios, Inc.,* 307 F. Supp. 2d 1085, 1095 (N.D. Cal. 2004) (accord). As such, as the district court held, there is no merit to Yout's suggestion (Appellant's Brief at 57), that "it is not at all clear… that the DMCA was intended to cover a circumstance where the supposed 'technological measure' was put in place not by the copyright owner, but a third party for its own reasons." Indeed, the copyright holders' ability to sue based on circumvention of a third party's access controls has provided a critical tool in enforcing Section 1201 and furthering the statute's salutary policies.

Moreover, Yout's argument that YouTube's encryption is ineffective under the statute because Yout claims it is easily defeated also defies the plain language of the statute and prior, controlling decisions. *See*, *e.g.*, *Corley*, 273 F.3d at 440, 452, 448.

### B.     Yout and Its *Amici* Persist in Raising Arguments Rejected by Courts

Even before Section 1201 became law, critics of the proposed statute and its underlying policy goals—including *amicus* Electronic Frontier Foundation

---

[12] AACS is an encryption scheme used on devices that play Blu-ray discs, which did not exist at the time of the *Reimerdes* decision.

("EFF")—argued that the statute impinges upon the Copyright Act's limitations of exclusive rights, such as the fair use defense (set forth in 17 U.S.C. § 107); and that the statute violates the First Amendment. Immediately after the statute took effect, these critics engaged in a series of lawsuits that raised these (and other) arguments. The position of Yout and EFF in this lawsuit is nothing more than another in a decades-long pattern of raising legally baseless court challenges to the DMCA. More specifically, Yout and its *amici* here assert that the district court's reading of Section 1201 prohibits Yout's users from using copyrighted works in a manner that qualifies as a fair use under Section 107. EFF also argues that because the Yout service purportedly has substantial non-infringing uses—including so-called "space-shifting"[13]—i.e., they claim Yout has not violated Section 1201 because under section 1201(a)(2)(B), the service has more than a limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a copyrighted work.[14] These arguments merely rehash stale,

---

[13] Courts, as well as Registers of Copyrights and Librarians of Congress, have repeatedly concluded that space shifting and format shifting do not qualify as fair uses under Section 107. *See*, *e.g.*, *Disney Enters.,* 869 F.3d at 862 ("The reported decisions unanimously reject the view that space-shifting is fair use under § 107.") (citations omitted); U.S. Copyright Office, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights* 107-126 (Oct. 2015).

[14] *Amicus* Github, Inc. raises issues about technologies that on their face differ from Yout's stream-ripping service and that are not before the Court. Disputes

16

erroneous arguments that courts have rejected for decades.

In *Corley*, 273 F.3d at 458-59, where EFF represented the Defendant-Appellants, this Court rejected the argument that the First Amendment or the fair use provisions of the Copyright Act serve as defenses to trafficking in anti-circumvention devices. *Accord*, *321 Studios*, 307 F. Supp. 2d at 1089; *United States v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1131 (N.D. Cal. 2002). Indeed, as recently as last December, the D.C. Circuit rejected a virtually identical challenge to Section 1201, in a case where EFF represents the plaintiffs. *See Green*, 54 F.4th at 746-47.

Yout also attempts to analogize its business model to Sony's Betamax obsolete video tape recorder, which was the subject of *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony-Betamax*"). There, the Supreme Court held *only* that using a Betamax device to record free, over-the-air, broadcast television programming for later viewing by consumers, and then deleting the content (i.e., "time-shifting"), constituted fair use in some circumstances; and that because the Betamax had substantial noninfringing uses (including time-shifting), Sony was not liable for copyright infringement. *Id*. at 454. Importantly, in *Sony-Betamax* the device manufacturer had no ongoing relationship with consumers. The Court emphasized that its opinion there would not control a case

---

regarding these technologies should be decided on their own merits if issues ever arise. Github's parade of horribles is speculative and unfounded given the history of Section 1201 and its measured enforcement.

like this one, where Congress acted expressly to deal with technology like Yout's stream-ripping service:

> Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.

*Id.* at 431.

The legislative landscape surrounding Section 1201 could not differ more starkly from that in *Sony-Betamax*. In passing Section 1201 years later, Congress accommodated fully the competing interests implicated by the advent of digital copying and transmission, and passed legislation that forecloses the defenses that Yout and *amicus* EFF raise.

In the final analysis, Yout and its *amici* seem to argue that copyright owners lose Section 1201's protections simply because their copyrighted works, on YouTube or any other, similar online service, are not behind a password-protected paywall. As discussed above, and in Appellees' brief, this notion undermines the entire purpose of the statute. And the Supreme Court has recognized there is an interest in "'the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public.'" *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 663-64 (1994) (*Turner I*) (addressing issues

under the Cable Act). In fact, YouTube's free, advertising-supported model—which Congress foresaw when passing the DMCA—makes expressive content available to those who might not have the wherewithal to afford to pay for premium content, in that way furthering copyright's balanced goals. The Supreme Court has held that preserving the benefits of free, over-the-air local broadcast television and promoting the widespread dissemination of information from a multiplicity of such sources serves important governmental interests. *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 189 (1997) (*Turner II*). The same crucial policies mandate the preservation of free, ad-supported content on the internet. For the reasons discussed above, Section 1201 provides critical protections to ensure that copyright holders continue to provide content on such platforms.

19

## CONCLUSION

Yout's illegal, stream-ripping software is a significant threat to copyright holders and ultimately the public.  If this Court adopts the arguments of Yout and its *amici*, protection for numerous business models will be devastated, resulting in less, not more, public access to copyrighted works.  Accordingly, *Amicus* urges that the district court's dismissal order be affirmed.


DATED: May 11, 2023          MITCHELL SILBERBERG & KNUPP LLP
Robert Rotstein
Eleanor M. Lackman


By:  /s/ Robert H. Rotstein
Robert H. Rotstein


Counsel for *Amicus Curiae*
Copyright Alliance

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1.     This Brief for *Amicus Curiae* Copyright Alliance in Support of Defendants-Appellees complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Fed. R. App. P. 29(a)(5), Second Circuit L. R. 29.1(c) and Second Circuit L. R 32.1(a)(4) because this brief contains 4,632 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and,

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, the word processing system used to prepare the brief, in 14-point Times New Roman font.


DATED: May 11, 2023   MITCHELL SILBERBERG & KNUPP LLP
           Robert Rotstein
           Eleanor M. Lackman

           By:  /s/ Robert H. Rotstein
             Robert H. Rotstein

           Counsel for *Amicus Curiae*
           Copyright Alliance

## CERTIFICATE OF SERVICE

I certify that on this 11th day of May, 2023, I electronically filed the foregoing Brief of *Amicus Curiae* using the Court's CM/ECF system which will send notification of such filing to all parties of record.

DATED: May 11, 2023        MITCHELL SILBERBERG & KNUPP LLP
Robert Rotstein
Eleanor M. Lackman

By:  /s/ Robert H. Rotstein
Robert H. Rotstein

Counsel for *Amicus Curiae*
Copyright Alliance