# 22-2760-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

YOUT LLC,

*Plaintiff-Appellant,*

– v. –

RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,
DOE RECORD COMPANIES, 1-10,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

VALENTIN GURVITS
FRANK SCARDINO
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
(617) 928-1800

EVAN FRAY-WITZER
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
(617) 426-0000

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 3

I.     The Cases Cited By the RIAA Were Almost Entirely Decided Only
       After Extensive Development of the Factual Record ..................................... 3

II.    Appellant's Answering Brief Urges the Court to Ignore the Elephant
       In the Room, Or, Rather, the Elephant-Sized Hole in the Room .................... 6

III.   Second Circuit Precedent Does Not Support the RIAA's Arguments .......... 13

IV.    The RIAA Willfully Mischaracterizes the Nature of the Service
       Provided by Yout ..................................................................................... 20

CONCLUSION ........................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
  307 F. Supp. 2d 1085 (N.D. Cal. 2004) ................................................................4

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004, 1019 (9th Cir. 2001) ........................................................4

*Arista Records, Inc. v. Mp3Board, Inc.*,
  2002 WL 1997918 (S.D.N.Y. Aug. 26, 2002) ........................................4

*Authenticom, Inc. v. CDK Glob., Inc. (In re Dealer Mgmt. Sys.*
  *Antitrust Litig.)*,
  362 F. Supp. 3d 558 (N.D. Ill. 2019) ....................................................10

*BMG Music v. Gonzalez*,
  430 F.3d 888 (7th Cir. 2005) ...................................................................4

*Davidson & Assocs. v. Jung*,
  422 F.3d 630 (8th Cir. 2005) .................................................................11

*DISH Network L.L.C. v. World Cable Inc.*,
  893 F. Supp. 2d 452 (E.D.N.Y. 2012) ...................................................10

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ...................................................................4

*Hattler v. Ashton*,
  2017 WL 11634742 (C.D. Cal. Apr. 20, 2017)........................................5

*In re Maxim Integrated Prods.*,
  2013 U.S. Dist. LEXIS 196320 (W.D. Pa. Mar. 19, 2013)...................11

*Jagex Ltd. v. Impulse Software*,
  750 F. Supp. 2d 228 (D. Mass. 2010).....................................................10

*Maule v. Anheuser Busch, LLC*,
  2018 U.S. Dist. LEXIS 125805 (E.D. Pa. July 27, 2018) ....................11

*MDY v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010) ................................................................4

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011) ...............................................................11

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
    657 F. Supp. 2d 878 (N.D. Ohio 2009) ...............................................4

*RealNetworks, Inc. v. DVD Copy Control Ass'n*,
    641 F. Supp. 2d 913 (N.D. Cal. 2009) ................................................4

*Schork Grp., Inc. v. Choice! Energy Servs., Retail, LP*,
    2022 U.S. Dist. LEXIS 130167 (E.D. Pa. July 21, 2022) ..................11

*UMG Recordings, Inc. v. Kurbanov*,
    No. 1:18-cv-957 ECF No. 139 (E.D. Va. Dec. 16, 2021) ...................4

*UMG Recordings, Inc. v. Kurbanov*,
    No. 1:18-cv-957 ECF No. 144 (E.D. Va. Feb. 10, 2022) ...................4

*UMG Recordings, Inc. v. MP3.com, Inc*.,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ...................................................4

*United City Studios v. Corley*,
    273 F.3d 429 (2d Cir. 2001) .......................................................*passim*

*Universal City Studios v. Reimerdes*,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) .............................................3, 8

**Statutes and Other Authorities:**

17 U.S.C. § 1201 .......................................................................*passim*

17 U.S.C. § 1201(a) ...........................................................................6

17 U.S.C. § 1201(a)(1).................................................................5, 6, 7

17 U.S.C. § 1201(a)(2).................................................................9, 12

17 U.S.C. § 1201(b) ...........................................................................9

17 U.S.C. § 1201(b)(1)........................................................................9

Fed. R. Civ. P. 12(b)(6).............................................................................1

H.R. Rep. No. 105-551, pt. 1 ...................................................................10

S. Rep. No. 105-190 (1998) .....................................................................11

## <u>INTRODUCTION</u>

It would be understandable if – after reading Defendant Recording Industries Association of America's ("RIAA") Answering Brief – this Court found itself perplexed about the procedural stage at which the underlying litigation was dismissed by the District Court. This case does not come before this Court following a trial during which the parties presented competing expert witnesses and a fully-developed factual record (as was true of some of the cases cited by the RIAA); nor does it come after a motion for summary judgment, where the parties (with the benefit of full discovery) presented the District Court with deposition testimony and documentary evidence (as is true of most of the cases cited by the RIAA). Indeed, this case does not even come before this Court following an evidentiary hearing and the grant of a preliminary injunction.

Given the RIAA's arguments – which rely heavily on unsupported assertions dressed up as facts ("facts" which appear nowhere within the four corners of the Complaint), inferences which impermissibly favor the Defendant, and disputed mixed questions of fact and law – it would be easy to forget that this case actually comes before this Court following the District Court's allowance of a Rule 12(b)(6) motion to dismiss: a decision that should have been (but which was not) limited to the four corners of Yout LLC's Complaint.

In an Answering Brief that is equally notable for what it does not say as what it does, Defendant Recording Industries Association of America ("RIAA") attempts to argue not only that it is entitled to rely on technology that it claims to have been put in place by YouTube, but that it makes no difference at all whether YouTube *intended* for the technology to limit the access to or the ability to copy the videos that are freely available on YouTube to anyone with an internet connection and a browser. And, while this is a remarkable position at odds with the case law of this Circuit and elsewhere, it is presumably the only position the RIAA can take given that YouTube has neither come to the RIAA's aid as an *amicus* nor have the parties had the opportunity to take discovery from YouTube (or any discovery for that matter) given the District Court's improvident allowance of the RIAA's 12(b)(6) motion to dismiss.

Ultimately, as the Court will see, the District Court erroneously concluded that Yout's software platform was a circumvention tool under 17 U.S.C. §1201, a conclusion that it could not possibly have reached at this early stage of the litigation, necessitating reversal.

**<u>ARGUMENT</u>**

I.      The Cases Cited By the RIAA Were Almost Entirely Decided Only
        <u>After Extensive Development of the Factual Record.</u>

Admittedly, it is somewhat rare that, in a Reply Brief, Appellant would feel

the need to reiterate for the Court the procedural posture from which the appeal

was taken.  Then again, it is also somewhat rare that, in its Answering Brief, an

Appellee would almost exclusively cite cases where the underlying litigation had

been decided at a much later stage of the proceedings.  And yet, such is the case

here.  In the substantive sections of its Answering Brief dealing with Yout's

Digital Millenium Copyright Act ("DMCA") claims, the RIAA relies most heavily

on this Court's decision in *United City Studios, Inc. v. Corley,* 273 F.3d 429, (2d

Cir. 2001)(discussed in detail, below) and the District Court decision underlying

*Corley*, *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 318

(S.D.N.Y. 2000).  That case, however, in addition to being easily distinguishable,

was decided only after a full bench trial in which the Court heard from and

weighed the testimony of the parties' witnesses, competing expert witnesses, and

documentary evidence (not to mention the completion of full discovery which

allowed the parties to present such evidence at trial).  Most of the other cases cited

by the RIAA were similarly decided on summary judgment, after the parties had

3

the opportunity to fully develop the factual record through discovery.[1]  A handful of other cases cited by the RIAA were decided after evidentiary hearings in connection with motions for preliminary injunctions.[2]  One other was a case decided on a default judgment though, even there, the Court relied on factual evidence presented as well as expert testimony.[3]

It is not an accident that each of these cases was decided at a much later stage of the proceedings.  As discussed in Yout's opening brief (and is evident even in reading the RIAA's answering brief), the issues at play in this case are complex, involve highly technical questions that are either entirely factual or are mixed questions of fact and law (and which, in either case, require expert

---

[1] *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp. 2d 1085, 1097 (N.D. Cal. 2004); *MDY v. Blizzard Ent., Inc.*, 629 F.3d 928, 946 (9th Cir. 2010); *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 878, 889 (N.D. Ohio 2009); *BMG Music v. Gonzalez*, 430 F.3d 888, 890–91 (7th Cir. 2005); *UMG Recordings, Inc. v. MP3.com, Inc*., 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000); *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV. 4660 (SHS), 2002 WL 1997918, at *15 (S.D.N.Y. Aug. 26, 2002).

[2] *RealNetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 918–19 (N.D. Cal. 2009); *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017); *A&M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1019 (9th Cir. 2001).

[3] *UMG Recordings, Inc. v. Kurbanov*, No. 1:18-cv-957 (CMH/TCB), ECF No. 139 at 8–11, 14–16, 20–21 (E.D. Va. Dec. 16, 2021), *report and recommendation adopted*, ECF No. 144 (E.D. Va. Feb. 10, 2022).

testimony), and which can only be resolved by a factfinder after the parties have had the opportunity to conduct full discovery.

Ironically, the *only* substantive anti-circumvention decision cited by the RIAA that *was* decided at the motion to dismiss stage supports *Yout's* arguments, not the RIAA's. *Hattler v. Ashton*, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017). The RIAA claims in its Answering Brief that *Ashton* rejected the "argument that because works were 'publicly available for streaming,' 'the "door" to the Works was open'…" Answering Brief, p. 40. But the RIAA's reading of *Ashton* (and its failure to note for this Court the *Ashton* court's ultimate ruling *dismissing*, as a matter of law, Plaintiff's claim of violation of the anti-circumvention provisions of the DMCA) is illustrative of the fallacy of the RIAA's repeated attempts to claim that there is no difference between the *access* control provisions of 12 U.S.C. §1201 and the *copy* control provisions of that section. To the contrary – after citing with approval this Court's decision in *Corley* and its discussion of the distinctions as between the two types of anti-circumvention provisions – the *Ashton* court specifically concluded that, even though the defendants there admitted that they had circumvented technology "expressly designed" to prevent the copying of the Works (something which Yout denies in this case), there was no violation of §1201(a)(1). *Ashton*, at *8 ("the statutory structure, appellate precedent, and legislative history of the DMCA all support the same conclusion.

Thus, where §1201(a)(1) refers to [a] technological measure that control[s] 'access' to a protected work, that section should be interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying. For the foregoing reasons, Plaintiff cannot state a claim for relief under §1201(a)(1). Further, because it is uncontested that the Works are available to the public on many websites, any effort to amend the SAC would be futile.")

Ultimately, this is simply not a case that can or should be decided on a motion to dismiss. The case turns on disputed factual questions (and mixed questions of fact and law) that will require the development of the factual record and testimony from expert witnesses. As such, the District Court's order dismissing the case should be reversed.

II.  Appellant's Answering Brief Urges the Court to Ignore the Elephant In the Room Or, Rather, the Elephant-Sized Hole In The Room.

The RIAA concedes, as it must, that neither it nor its members have *themselves* put in place any kind of "technological measure" that would have to be circumvented in order to access or copy the relevant works. The existence of such a technological measure is, of course, required for there to be a violation of *either* §1201(a) or §1201(b). Instead, the RIAA relies on the way in which YouTube *appears* to operate in its assumption of both the existence of a "technological measure" and the purpose of the technology at play. That the RIAA must resort to

these factual assumptions (as did the District Court below as well) simply proves that the present case is not susceptible to a Rule 12(b)(6) motion to dismiss.

The reason that the RIAA (and the District Court) made such factual assumptions is because there is no evidence before the Court (nor was the District Court presented with any evidence) from YouTube itself concerning either the specifics of the technology employed or the *purpose* of such technology. Given the RIAA's assertion that its members "own or control the copyrights in the great majority of the world's most popular sound recordings," its assertion that the relationship between its members and YouTube "are the cornerstone of the digital music economy,"[4] and the sky-is-falling insistence of its *amicus* that a reversal of the District Court's order would "eviscerate" the protections afforded by §1201 and "would harm and undermine popular methods of disseminating the speech of copyright owners,"[5] one might have assumed that YouTube itself would have appeared on Appellants behalf as an *amicus*. That it did not leaves an elephant-sized hole in the room.

The RIAA attempts to cover this enormous hole with fig leaves, astonishingly arguing that the *purpose* of the technology employed by YouTube is irrelevant and should simply be ignored by the Court (as it was by the District

---

[4] Answering Brief, p. 1.
[5] Brief for *Amicus Curiae* Copyright Alliance, p. 2.

Court).

The RIAA first attempts to argue that the *purpose* of the technology employed by YouTube is irrelevant, oddly citing the Court's decision in *Reimerdes* for the proposition that "what matters is whether the 'function' of the technological measure is to control access." Answering Brief, pp. 30-31 (quoting *Reimerdes* as holding that a "technological measure 'effectively controls access' to a copyrighted work if its function is to control access.") Putting aside the obvious fact that this quotation does not actually attempt to define what is or is not a "technological measure" but rather when a "technological measure" effectively controls access, the RIAA seems to misapprehend the plain meaning of the word "function." According to the Merriam-Webster Dictionary "function" is defined as "the action for which a person or thing is specially fitted or used or for which a thing exists: PURPOSE."[6] The RIAA's own citation, then, demonstrates that the *purpose* of the technology employed is indeed crucial.

The RIAA then pivots, arguing that YouTube's intent in utilizing technology is irrelevant because, in its reading, §1201 (which does not attempt to define a "technological measure") is supposedly silent as to intent. This assertion is incorrect and defies common sense. A plain reading of the statute confirms this position. Had Congress wanted §1201 to be intent-free, as the RIAA asserts, it

---

[6] https://www.merriam-webster.com/dictionary/function

could easily have easily said that "No person shall circumvent **technology** that effectively controls access to a work protected under this title." Such a provision would include any *technology* that effectively controlled access to a work, regardless of whether the technology had been put in place for the *purpose* of controlling access. It did not. Instead, §1201 regulates the circumvention of a "**technological measure** that effectively controls access to a work protected under this title." Again, since the statute does not define a "measure," the Court should consult the plain meaning of the term. The Merriam-Webster Dictionary defines a "measure" as "a step planned or taken as a means to an end."[7]

This Court recognized this common-sense reading of §1201 in *Corley*, holding that "the focus of subsection 1201(a)(2) is circumvention of technologies **designed to** *prevent access* to a work, and the focus of subsection 1201(b)(1) is circumvention of technologies **designed to** *permit access* to a work but *prevent copying* of the work or some other act that infringes a copyright." *Corley,* 273 F.3d at 441 (bold added, italics in original). Indeed, this requirement is also consistent with the *Corley*'s explanation that "The DMCA therefore backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections." *Id.* at 435.

---

[7] https://www.merriam-webster.com/dictionary/measure?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

*See also DISH Network L.L.C. v. World Cable Inc.,* 893 F. Supp. 2d 452, 465 (E.D.N.Y. 2012)("By way of analogy, Congress explained that: 'The act of circumventing a technological protection measure **put in place by a copyright owner to control access to a copyrighted work** is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book.' H.R. Rep. No. 105-551, pt. 1, at 17 (1998). In this case, the room was already unlocked, and therefore the Defendants did not have to 'break in' to gain access to the copyrighted work. While lying to convince the Plaintiffs to open the door and then stealing, copying, and selling the content of the books inside the room may violate other laws, they do not violate the DMCA")(bold added).

Numerous other courts have similarly referenced the statute's clear requirement that the technology employed be designed or intended to restrict access or copying. *See, e.g., Authenticom, Inc. v. CDK Glob., Inc. (In re Dealer Mgmt. Sys. Antitrust Litig.),* 362 F. Supp. 3d 558, 572 n.8 (N.D. Ill. 2019)("Authenticom attempts to argue that these out of circuit authorities were incorrectly decided because they focus on the intent of the technological measures taken, but the statute does not reference intent. … Still, as Authenticom recognizes, the relevant standard is whether a technological measure that effectively controls access was circumvented. Thus, to the extent that a measure is designed to control access and does so effectively, intent may be relevant"); *Jagex Ltd. v. Impulse*

*Software*, 750 F. Supp. 2d 228, 237 (D. Mass. 2010)("the Runescape website is generally accessible to the public and has no specific technological measure **designed to** block access to copyrighted works. Accordingly, Jagex is unlikely to succeed on the merits of its DMCA claim")(bold added); *Davidson & Assocs. v. Jung,* 422 F.3d 630, 640 (8th Cir. 2005)("In other words, although both sections prohibit trafficking in a circumvention technology, the focus of § 1201(a)(2) is circumvention of technologies **designed to** prevent access to a work, and the focus of § 1201(b)(1) is circumvention of technologies **designed to** permit access to a work but prevent copying of the work or some other act that infringes a copyright. See S.Rep. No. 105-190, at 11-12 (1998)")(bold added); *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 300 (3d Cir. 2011)("Thus, for example, if a movie studio encrypts a DVD so that it cannot be copied without special software or hardware, and an individual uses his own software to 'crack' the encryption and make copies without permission, the studio may pursue the copier both for simple infringement under the Copyright Act and, separately, for his circumvention of the encryption, which is a 'technological measure' **designed to** 'control . . . access to' the DVD, under the DMCA.")(bold added); *Schork Grp., Inc. v. Choice! Energy Servs., Retail, LP*, 2022 U.S. Dist. LEXIS 130167, at *27 (E.D. Pa. July 21, 2022)(same); *Maule v. Anheuser Busch, LLC*, 2018 U.S. Dist. LEXIS 125805, at *15 (E.D. Pa. July 27, 2018)(same); *In re Maxim Integrated Prods.,* 2013 U.S.

Dist. LEXIS 196320, at *101-02 (W.D. Pa. Mar. 19, 2013)("Other courts have found encryption programs to be a technological measure designed to control access to copyrighted material for purposes of the DMCA")(collecting cases).

Finally, the RIAA asserts that YouTube's intent can be *inferred* from YouTube's Terms of Service (Answering Brief, p. 31), of which the RIAA asserts the District Court properly took judicial notice because they were part of the "pleadings" (*Id.*), supposedly having been referenced in paragraph 100 of the operative complaint. (Answering Brief, p. 13, n.2.). Putting aside the fact that such an inference in the RIAA's favor would be improper at the motion to dismiss stage, the operative complaint ***does not*** reference YouTube's Terms of Service, but rather it references *Yout's* Terms of Service and FAQs. The footnote to paragraph 100 of the operative complaint (found on JA-58) reads, in relevant part, "Yout's software platform operates using configured version of youtube-dl with ffmpeg to ensure that no storage of content occurs as seen in the terms of service and FAQ." Despite the RIAA's assertion to the contrary, this is a clear reference to Yout's Terms of Service and FAQs, not YouTube's. *See* Yout's Terms of Service located at https://yout.com/terms/ ("As Yout does not store any links to third party content, via a configuration of youtube-dl and ffmpeg wrapped in a GoLang binary or similar software, all which does not bypass any DRM, and you will be supplying any link to use with Yout and its services, Yout cannot and does not review the

content at such third-party sites. For obvious reasons, Yout does not endorse or assert any rights over such content") and Yout's FAQs, located at https://yout.com/faq/ ("Our platform does not know the size of the streaming file you will be recording as the file does not originate on our platform and will not be save[d] on our platform.")  Because YouTube's Terms of Service were not referenced in the Complaint, they were improperly considered by the District Court and should not be considered as part of this Court's *de novo* review.

III.    <u>Second Circuit Precedent Does Not Support the RIAA's Arguments.</u>

Throughout its Answering Brief, the RIAA cites extensively to this Court's opinion in *Corley.*  Indeed, given that the *Corley* decision is the only substantive Second Circuit Court of Appeals decision concerning the anti-circumvention provisions of the DMCA cited by the RIAA, it is worth unpacking in some detail the ways in which *Corley* differs from the present case.  Indeed, *Corley* is so factually dissimilar from the present case that it could serve as an issue spotting exam for law students learning to distinguish cases.  This is not to say that *Corley* is not instructive: it is.  The well-reasoned *Corley* decision remains one of the most highly-cited anti-circumvention cases, and yet the differences between that case and this one serve to demonstrate only that the cases are so factually dissimilar as to require different results.

Even before delving into the facts of *Corley*, however, it bears noting that the case came before this Court with a radically different procedural posture. *Corley* came to the Court following full discovery and a bench trial in which the parties were able to present witnesses, expert testimony, and documentary evidence to support their respective positions. Armed with this fully developed record, the District Court and this Court were able to make the necessary factual findings and rulings of law. None of that has occurred here.

In any event, the *Corley* Plaintiffs were eight major motion picture studios (the "Studios") who brought suit against Defendant Eric Corley and his company, 2600 Enterprises, Inc. (collectively the "Corley Defendants") alleging violations of the anti-circumvention provisions of the DMCA. *Corley* at 434-436. The factual background of the case, as detailed by this Court was as follows:

In the early 1990s, the Studios began to consider the possibility of distributing their films digitally on DVDs. Concerned, however, that digital distribution would enable the widespread copying and distribution of near-perfect illegal copies of their films, the Studios "sought an encryption scheme to protect movies on DVDs," enlisting "the help of members of the consumer electronics and computer industries, who in mid-1996 developed the Content Scramble System ('CSS'). CSS is an encryption scheme that employs an algorithm configured by a set of 'keys' to encrypt a DVD's contents. …Decryption in the case of CSS

requires a set of 'player keys' contained in compliant DVD players, as well as an understanding of the CSS encryption algorithm. Without the player keys and the algorithm, a DVD player cannot access the contents of a DVD. With the player keys and the algorithm, a DVD player can display the movie on a television or a computer screen, but does not give a viewer the ability to use the copy function of the computer to copy the movie or to manipulate the digital content of the DVD." *Corley* at 436-437.

It is worth pausing again to note additional significant differences between *Corley* and the present case: in *Corley*, the evidence demonstrated that the rightsholders actually created a technological measure – an encryption algorithm – with the specific intent that this algorithm would effectively control *both* access to the copyrighted works and the ability to copy those works. This type of technological measure is commonly referred to as a Digital Rights Management ("DRM") tool. In providing their works to YouTube, the RIAA's members have chosen *not* to incorporate DRM tools – the inclusion of such tools would render any video protected by such a tool incapable of download by Yout. Second Amended Complaint, ¶¶57, 92 at JA-43 and JA-57.

The Studios then additionally "developed a licensing scheme for distributing the technology to manufacturers of DVD players. Player keys and other information necessary to the CSS scheme were given to manufacturers of DVD

players for an administrative fee. In exchange for the licenses, manufacturers were obliged to keep the player keys confidential. Manufacturers were also required in the licensing agreement to prevent the transmission of 'CSS data' from a DVD drive to any 'internal recording device,' including, presumably, a computer hard drive.  With encryption technology and licensing agreements in hand, the studios began releasing movies on DVDs in 1997, and DVDs quickly gained in popularity, becoming a significant source of studio revenue." *Corley* at 437.

Here, too, it is worth pausing to note what should be an obvious material distinction between *Corley* and the present case – indeed, it is a material distinction between the present case and almost every substantive case cited by the RIAA: in *Corley*, the copyrighted work (*i.e.*, the movie) was not made freely available to the general public but rather was only available through the purchase of a DVD, drastically limiting access to the copyrighted works.

The *Corley* Defendants published "a print magazine and… affiliated web site geared towards 'hackers,' a digital-era term often applied to those interested in techniques for circumventing protections of computers and computer data from unauthorized access." *Corley* at 435.  More specifically, Defendants' website, 2600.com and the companion print magazine, *2600: Hacker Quarterly*, focused "on the vulnerability of computer security systems, and more specifically, how to exploit that vulnerability in order to circumvent the security systems.

16

Representative articles explain how to steal an Internet domain name and how to break into the computer systems at Federal Express." *Id.* at 439.

In 1999, a Norwegian teenager and two unidentified individuals he met on the internet created a computer program specifically designed decrypt CSS encryption, which "was called, appropriately enough, 'DeCSS'". *Id.* at 437. The teenager posted the DeCSS code on his website and it quickly spread on the internet. *Id.* at 437. The Corley Defendants published an article about DeCSS in their magazine and on their website. That article "detailed how CSS was cracked, and described the movie industry's efforts to shut down web sites posting DeCSS. It also explained that DeCSS could be used to copy DVDs. At the end of the article, the Defendants posted copies of the object and source code of DeCSS. …Corley also added to the article links that he explained would take the reader to other web sites where DeCSS could be found." *Id.* at 439. Corley had testified at trial that he published the actual code because he thought it was incumbent on him to show his readers the evidence "that there is in fact technology that circumvents CSS." *Id.*

Hundreds of websites posted the DeCSS code; the Studios responded with cease-and-desist letters but some websites, including that of the Corley Defendants', refused to take down the DeCSS code, resulting in the litigation. Following a full trial on the merits (which included the testimony of a variety of

expert witnesses), the trial court found that Corley Defendants' publication of the DeCSS code violated the anti-trafficking provisions of the DMCA, issuing a permanent injunction against the Corley Defendants. *Id.* at 441.

To recap, then, *Corley* involved a case in which the District Court, after a full trial, found that the Studios had developed and implemented a technological measure – namely the CSS encryption – with the specific intent that such encryption would both block access to and the copying of the movies that the studios intended to sell on DVDs. In addition, the Studios licensed to DVD-player manufacturers the specific technological "key" necessary for those DVD players to access and play the copyrighted works. Without this "key," users could not access the copyrighted works. And, the Studios only agreed to provide such licenses to DVD manufacturers who agreed to manufacture their players in such a manner that the players could not copy or save the copyrighted works to a hard drive. And, of course, the movies at issue in *Corley* were not freely provided to the entire world, but rather were sold to consumers only on DVDs that incorporated this CSS encryption.

The Corley Defendants knowingly provided access to technology with a singular purpose – breaking the encryption on the DVDs containing the Studios' copyrighted works.

18

The present case could not be more dissimilar: there has been no development of any factual record because the case comes before this Court after a motion to dismiss; the RIAA's members have not themselves put in place any technology designed to prevent either the access or copying of their content, instead they have agreed to allow their content to be broadcast to the entire world. The RIAA's members only claim to rely on technology allegedly employed by YouTube for reasons which may have nothing to do with the prevention of access or copying at all.[8]

---

[8] To be sure, in its Answering Brief, the RIAA claims that: "RIAA members authorize online streaming services, such as Google's YouTube, to stream their copyrighted works. In return, Google shares revenue it earns from advertising or subscriptions with RIAA members and protects their copyrighted sound recordings from unauthorized access and copying." Answering Brief, p. 1. No part of this factual statement, however, can be considered by the Court because none of these alleged "facts" are contained within the four corners of the Complaint. Additionally, this "assertion" runs counter to statements the RIAA has frequently made in the public press. *See, e.g.,* "Medium: Five Stubborn Truths About YouTube and The Value Gap," located at https://www.riaa.com/medium-five-stubborn-truths-youtube-value-gap/ (RIAA alleging that YouTube artificially suppresses the amounts it pays to its members by offering "take it or leave it" agreements to the recording labels knowing that the music content will be available on YouTube regardless); "RIAA Head: We'll Never Have A Fair Deal With YouTube Under Current Copyright Law," *Consumerist* located at https://consumerist.com/2016/04/11/riaa-head-well-never-have-a-fair-deal-with-youtube-under-current-copyright-law/; "RIAA Says YouTube is Running a DMCA Protection Racket," *TorrentFreak*, located at https://torrentfreak.com/riaa-says-youtube-is-running-a-dmca-protection-racket-160412/; "Major record labels again complain of unfair YouTube deals as contracts set to expire," *9To5Google*, located at https://9to5google.com/2016/04/11/record-labels-youtube-riaa-royalities-complaint/; "Here's why the music labels are furious at YouTube. Again," *Vox,*

IV.   The RIAA Willfully Mischaracterizes the Nature of the Service
        Provided by Yout.

Finally, without any factual basis, the RIAA repeatedly asserts that the

Yout.com website has no purpose *but* to allow users to infringe upon its members'

copyrighted works and that it is specifically marketed as serving that purpose.  *See,*

*e.g.,* Answering Brief, pp. 3, 24, 25, 49-51.  To paraphrase one of the RIAA

members' recording artists: You're so vain, I bet you think this software's about

you.[9]

Although it is certainly true that the RIAA's members provide their works to

YouTube for the purpose of allowing YouTube to make those works freely

available to anyone with access to the internet and a computer with an internet

browser, such music represents only a small portion of the totality of the videos

---

located at https://www.vox.com/2016/4/11/11586030/youtube-google-dmca-riaa-cary-sherman.

This points up precisely the types of facts that can – and should – be developed through discovery and trial.  What agreements do the RIAA members have with YouTube (if any)?  What representations have been made as between the RIAA members and YouTube concerning access and/or copying controls?  What do the agreements as between the RIAA members and YouTube say about the assumption of risk of access and copying? Why have the RIAA members decided not to utilize any Digital Rights Management tools (like encryption) which would have prevented Yout's service from operating at all? The premature end to the present litigation has foreclosed the very factfinding that would enable this Court to properly determine whether any of the anti-circumvention or anti-trafficking provisions of the DMCA are implicated by the service provided by Yout.

[9] With sincere apologies to Carly Simon.

available on YouTube. Indeed (as of 2016 at least), by some estimates, music related videos account for only 2.5% of all of YouTube's traffic. *See Digital Music News*, "YouTube Says Just 2.5% Of Its Traffic Is Music-Related" (April 29, 2016) located at https://www.digitalmusicnews.com/2016/04/29/youtube-says-just-2-5-of-its-traffic-is-music-related. This, of course, does not even mean that 2.5% of YouTube's traffic involved the RIAA's members' music, but rather music as a whole constituted only 2.5% of YouTube's traffic. This included music that is copyrighted; music that is subject to a Creative Commons license; and music freely offered to the public without any restriction. And, of course, given YouTube's international reach, much of that music is itself likely from outside the United States and thus not owned by the RIAA's members. Moreover, YouTube streams videos that fall into every conceivable category and variety: from funny cat videos, to "how to" repair videos, to university lectures, and everything in between.

The service provided by Yout is content-neutral, providing nothing more than a recording device that utilizes the very information that is freely and publicly available to anyone who cares to look for it, without the need to circumvent any technological measures. As Yout and its *amici* have all pointed out, the service has significant commercial uses other than to circumvent protections afforded by a technical measure that effectively protects the rights of a copyright owner. To the

extent that the RIAA thinks otherwise, it should have the opportunity to prove that theory… at a trial following discovery.

## CONCLUSION

For the reasons stated hereinabove and in Yout's Opening Brief, this Court should REVERSE the District Court's judgment dismissing Yout's Complaint and REMAND for further proceedings consistent with such reversal.


Respectfully submitted,

/s/ Evan Fray-Witzer
EVAN FRAY-WITZER
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, Massachusetts 02116
(617) 426-0000
− and −
VALENTIN GURVITS
FRANK SCARDINO
Boston Law Group, PC
825 Beacon Street, Suite 20
Newton Centre, Massachusetts 02459
(617) 928-1800
*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 5,035 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated:  May 25, 2023