# 22-2760

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

YOUT LLC,

*Plaintiff – Appellant*,

v.

RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.,

DOE RECORD COMPANIES, 1-10

*Defendant – Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT (NEW HAVEN)

CASE NO. 20-cv-1602 (SRU) (RAR)

**BRIEF FOR *AMICI CURIAE* SUNO, INC. AND UNCHARTED LABS, INC.,
d/b/a UDIO.COM IN SUPPORT OF NEITHER PARTY**

LUKE ALI BUDIARDJO
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

ANDREW M. GASS
BRITTANY N. LOVEJOY
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

[counsel continued on next page]

SARANG V. DAMLE
RUTH HIRSCH
Latham & Watkins LLP
555 11th Street, NW Suite 1000
Washington, DC 20004
Telephone: (202) 637-3317
Facsimile: (202) 637-2201

*Counsel for Amici Curiae Suno, Inc. and Uncharted Labs, Inc., d/b/a Udio.com*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), Uncharted labs, Inc., d/b/a/ Udio.com, states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), Suno, Inc. states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICI CURIAE ............................................................1

ARGUMENT ....................................................................................5

    A.    Congress Designed Section 1201 to Protect Fair Users........................6

    B.    The District Court Misconstrued the Statute.......................................13

# TABLE OF AUTHORITIES

**Pages**

## CASES

*All. of Artists and Recording Cos., Inc. v. Gen. Motors Co.*,
  162 F. Supp. 3d 8 (D.D.C. 2016) ........................................................................8

*Bartz v. Anthropic PBC*,
  No. 24-cv-05417, 2025 WL 1741691 (N.D. Cal. June 23, 2025) ......................1

*Berlin v. E.C. Publications, Inc.*,
  329 F.2d 541 (2d Cir. 1964) ..............................................................................18

*Chamberlain Grp., Inc. v. Skylink Techs., Inc.*,
  381 F.3d 1178 (Fed. Cir. 2004) ...........................................................................2

*Green v. U.S. Dep't of Just.*,
  111 F.4th 81 (D.C. Cir. 2024)...............................................................................2

*Hattler v. Ashton*,
  No. 16-cv-04099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017)......................5

*Kadrey v. Meta Platforms, Inc.*,
  No. 23-cv-03417, 2025 WL 1752484 (N.D. Cal. June 25, 2025) ......................1

*London-Sire Recs., Inc. v. Doe 1*,
  542 F. Supp. 2d 153 (D. Mass. 2008)................................................................16

*Nat'l Assn. of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007)...........................................................................................15

*RSD Leasing, Inc. v. Navistar Int'l Corp.*,
  81 F.4th 153 (2d Cir. 2023) ...............................................................................16

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984).............................................................................................3

*U.S. v. Elcom Ltd.*,
  203 F. Supp. 2d 1111 (N.D. Cal. 2002).................................................... 11, 12

*United States v. Johnson*,
  961 F.3d 181 (2d Cir. 2020) ..............................................................................16

iii

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001) ..................................................... 7, 11, 17

## STATUTES

17 U.S.C. § 102 ..................................................................................17

17 U.S.C. § 106 .............................................................................. 3, 7, 8

17 U.S.C. § 107 ................................................................................ 1, 11

17 U.S.C. § 1201 ....................................................................... passim

## OTHER AUTHORITIES

H.R. 2281, 105th Cong. § 1201 (1997) ...................................................7

H.R. Rep. No. 105-551, pt. 1 (1998) ...................................................12

Jessica D. Litman, *Digital Copyright* 131 (Ch. 9) (2d ed. 2006),
    available at https://repository.law.umich.edu/books/1/ ......................10

NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. § 1201
    (1995) ...............................................................................................9

NII Copyright Protection Act of 1995: Hearing before Subcomm. On
    Courts and Intell. Prop., pt. 2, 104th Cong. (1996) ............................10

WIPO Copyright Treaties Implementation Act; and Online Copyright
    Liab. Limitation Act: Hearing before the Subcomm. on Cts. and
    Intell. Prop. 105th Cong. (1997) ................................................. 2, 11

S. Rep. No. 105-190 (1998) ...................................................................7

U.S. Copyright Office, *The Digit. Millennium Copyright Act of 1998:*
    (Dec. 1998), https://www.copyright.gov/legislation/dmca.pdf ................. passim

U.S. Copyright Office, *Section 1201 of Title 17: A Report of the
    Register of Copyrights* (June 2017),
    https://www.copyright.gov/policy/1201/section-1201-full-
    report.pdf .................................................................................. passim

## INTEREST OF AMICI CURIAE[1]

Suno, Inc. and Uncharted Labs, Inc., d/b/a Udio.com ("Amici") are startups that offer artificial intelligence-powered tools for making new music. Their tools are powered by "neural networks" that were "trained" by analyzing vast quantities of pre-existing recordings. By studying the auditory characteristics of those recordings, the tools develop statistical insights regarding the building blocks of music: what various genres and styles sound like; how songs are harmonized and structured; the timbres of the instruments; and so on. The tools then use these discoveries to generate entirely new music from scratch.

Both Amici assert that their use of pre-existing recordings to develop statistical insights about music, in the service of generating altogether new music, is a fair use under section 107 of the Copyright Act.[2] The order on appeal is not about fair use. But Amici have an interest in this appeal because the ruling below jeopardizes the fair use doctrine by misconstruing the anti-circumvention provisions of section 1201 of the Digital Millennium Copyright Act ("DMCA").

---

[1] No counsel for a party authored this brief in whole or in part; and no such counsel, any party, or any other person or entity—other than Amici and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *See Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691, at *7 (N.D. Cal. June 23, 2025) (use of books to train AI model was "transformative—spectacularly so"); *see also Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, 2025 WL 1752484, at *9 (N.D. Cal. June 25, 2025) (similar).

Section 1201 governs the circumvention of "technological measure[s]." 17 U.S.C. § 1201. Courts have held that Congress did not directly provide for a fair-use defense to claims brought under section 1201,[3] notwithstanding serious concerns about how the new prohibition could frustrate fair uses.[4] Instead, on this view, Congress harmonized section 1201 with fair use by drawing a careful distinction between two different kinds of technological protection mechanisms—access controls and copy controls—and drafting a statute that prohibited circumvention only of the former (access controls, *see* 17 U.S.C. § 1201(a)), not the latter (copy controls, *see id.* § 1201(b)).

Neither party focused on this access-control/copy-control distinction in the proceedings below. And for good reason: Yout is primarily accused of trafficking in a device designed to circumvent technological protection mechanisms, and the statute's anti-trafficking provisions apply with equal force to both access controls and copy controls. *See id.* §§ 1201(a)(2), (b)(1). As a result, the merits of Yout's declaratory judgment action will not turn on whether the technological measure at

---

[3] *See, e.g.*, *Green v. U.S. Dep't of Just.*, 111 F.4th 81, 90 (D.C. Cir. 2024); *but see Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1202-03 (Fed. Cir. 2004).

[4] *See* WIPO Copyright Treaties Implementation Act; and Online Copyright Liab. Limitation Act: Hearing before the Subcomm. on Cts. and Intell. Prop. 105th Cong. 46–47, 49 (1997) (testimony of Marybeth Peters, Register of Copyrights) (hereinafter "1997 Hearings").

the center of this appeal—which purportedly makes it more difficult to download the videos on YouTube's platform—is a copy control or an access control. But that question has significant implications outside this case for parties who, unlike Yout, do not traffic in any tool or offer a service to circumvent such a mechanism, but instead "circumvent" it themselves. If YouTube's download-prevention mechanism is a copy control, that act of circumvention is perfectly lawful. If it is an access control, that act of circumvention is presumptively unlawful.[5]

This statutory asymmetry was intentional: Congress enacted it specifically to protect fair users.[6] Copy controls, by definition, "protect [the] right[s] of a copyright owner," including by preventing unauthorized reproduction of copyrighted works. 17 U.S.C. § 1201(b)(2)(B); *see id.* § 106 (setting forth exclusive rights). But not all reproductions are prohibited by copyright law: "Any individual may reproduce a copyrighted work for a 'fair use;' the copyright owner does not possess the exclusive right to such a use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S.

---

[5] Assuming, of course, that the mechanism "effectively controls access to a work" within the meaning of 17 U.S.C. § 1201(a)(1)(A) and (a)(3)(B), and that the act qualifies as "circumvent[ion] [of] a technological measure" within the meaning of 17 U.S.C. § 1201(a)(3)(A).

[6] U.S. Copyright Office, *The Digit. Millennium Copyright Act of 1998: U.S. Copyright Off. Summary*, at 4 (Dec. 1998), https://www.copyright.gov/legislation/dmca.pdf (hereinafter "USCO 1998 DMCA Summary") (carve-out for copy controls designed to "assure that the public will have the continued ability to make fair use of copyrighted works").

417, 433 (1984). Enacting a statute that would penalize circumvention of copy controls would, in effect, give copyright owners the *de facto* right to prohibit fair uses. So while Congress enacted a prohibition on the provision of <u>devices</u> designed to circumvent copy controls, it declined to prohibit the <u>act</u> of circumventing those controls, so that it would not effectively impose liability on fair users.

The ruling below jeopardizes this carefully calibrated statutory framework. The "technological measure" under review in this case is designed for a single purpose: to "protect . . . works on YouTube from unauthorized copying/downloading." JA27, 29, 31 (RIAA's DMCA notices). That makes it a copy control, *i.e.*, a "technological measure that prevents copying." USCO 1998 DMCA Summary at 3; *see also* 17 U.S.C. § 1201(b)(2). It is not an access control.

The court below did not appreciate the importance of the access-control/copy-control distinction, or the fact that the statute treats them differently to protect fair uses. Instead, the court declined to consider the copy-control provision at all on procedural grounds, *see* JA274 n.14, and erroneously concluded that YouTube's download-prevention mechanism was an access control, *id.* JA253–54, without ever considering whether it is more appropriately characterized as a copy control.

That was an error with serious implications. It suggests that anyone who downloads a YouTube video—including not only AI startups, but also documentary filmmakers, teachers, and the like—is liable for statutory penalties under the DMCA,

even if that person's activities fall squarely within the contours of fair use. *Cf. supra* note 1. Copyright holders have already attempted to rely on the court's error to justify assertion of section 1201 claims on the basis of unauthorized downloads of publicly accessible copyrighted works—and to argue that those claims should survive even if the defendants' use of those works is adjudicated to be a fair use.[7]

This is precisely what Congress sought to avoid. This Court should correct that error and hold that, to the extent YouTube's download-prevention mechanism is a section 1201-qualifying measure, it is a copy control under section 1201(b), not an access control under section 1201(a).

## ARGUMENT

The "statutory structure, appellate precedent and legislative history of the DMCA" all support the conclusion that Congress designed section 1201 so that it would not prohibit the circumvention of technological measures that "permit access to [a] copyrighted work, but restrict copying." *Hattler v. Ashton*, No. 16-cv-04099, 2017 WL 11634742, at *8 (C.D. Cal. Apr. 20, 2017) (dismissing claim because

---

[7] *See* Am. Compl. ¶¶ 84, 122 (ECF 119), *UMG Recordings, Inc. v. Uncharted Labs, Inc., d/b/a/ Udio.com* ("*Udio*"), No. 24-cv-04777 (S.D.N.Y. Oct. 6, 2025) (asserting section 1201 claim and suggesting that "fair use is not a defense for breach of the Copyright Act's anti-circumvention clause"); *see also* Proposed Am. Compl. Ex. A ¶ 78 (ECF 126-3), *in UMG Recordings, Inc. v. Suno, Inc.* ("*Suno*"), No. 24-cv-11611 (D. Mass. Sept. 19, 2025) (asserting Section 1201 claim based on downloading of YouTube videos); *see generally* Opp. to Mot. to Amend (ECF 131) *in Suno*, No. 24-cv-11611 (D. Mass. Oct. 3, 2025).

downloading work from a platform "where the Works were available for streaming" is not a section 1201 violation). This was an intentional choice Congress made to "assure that the public will have the continued ability to make fair use of copyrighted works." USCO 1998 DMCA Summary at 4; *infra* Part A.

The court below failed to recognize the critical distinction between access controls and copy controls. And its holding that YouTube's download-prevention mechanism is an access control under 17 U.S.C. § 1201(a)(1) was based on a blinkered interpretation of the word "access" that did not sufficiently account for the broader statutory context, and would unravel Congress's attempt to define access controls and copy controls separately. *Infra* Part B. That threatens to undo Congress's considered decision to harmonize section 1201 with fair use, and could potentially expose countless fair users—including Amici—to serious penalties for violating the DMCA, even if their activities fall well within the bounds of fair use. This Court should correct that error.

### A. Congress Designed Section 1201 to Protect Fair Users

Section 1201 addresses two categories of "technological measures." Section 1201(<u>a</u>) addresses what are commonly referred to as "<u>access controls</u>." These are "measures that effectively control <u>access</u> to a copyrighted work." 17 U.S.C. § 1201(a) (emphasis added). To "control access to a work" means to prevent the public from viewing, reading, or using its content, e.g., by "encrypt[ing]" the content

of a book so that it cannot be read, or "scramb[ling]" an audio file so that it cannot be played. *Id.* § 1201(a)(3)(A); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 441 (2d Cir. 2001) (access controls are "technologies designed to *prevent access* to a work"); *see also* S. Rep. No. 105-190 at 12 (1998) (hereinafter "Senate Judiciary Committee Report") (access controls "limit[] access to the plain text of a work").

The quintessential access control is a "password requirement limiting access to a website to paying customers." U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of Copyrights* at 6 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf (hereinafter "USCO 2017 DMCA Report"). The function of the "password requirement" is to prevent anyone who lacks the "authority of the copyright owner" from "gain[ing] access to the work." 17 U.S.C. § 1201(a)(3)(B). In so doing, the password requirement "controls access" to the work. *Id.*

Section 1201(b) addresses what are commonly referred to as "copy controls." USCO 2017 DMCA Report at 6. These are measures that "prevent[], restrict[], or otherwise limit[] the exercise of a right of a copyright owner under this title," 17 U.S.C. § 1201(b)(2)(B), including the copyright owner's exclusive right of reproduction, *see id.* § 106(1). They kick in after a user has gained access to a work by, e.g., "preventing the copying of an e-book after it has been downloaded to a

user's device." USCO 2017 DMCA Report at 6. As Judge Newman explained in *Universal City Studios, Inc. v. Corley*, copy controls are "technologies designed to *permit access* to a work but *prevent copying* of the work." 273 F.3d at 441 (emphasis in original); *see also* Senate Judiciary Committee Report at 12 (copy controls "do[] nothing to prevent access to the plain text of the work, but [are] designed to prevent that work from being copied").

The quintessential copy control is a system that prohibits the subsequent copying of an audio tape. *See, e.g.*, *All. of Artists and Recording Cos., Inc. v. Gen. Motors Co.*, 162 F. Supp. 3d 8, 10–11 (D.D.C. 2016) (describing a system that "prevents any copies being made from [] copies" of digital audio tapes). Such a system does not prohibit a user who possesses the tape from listening to it, which means it is not an access control. 17 U.S.C. § 1201(a). But it does prevent that user from creating an unauthorized reproduction of the tape, and in so doing "effectively protects a right of a copyright owner," *id.* § 1201(b)(1)(A)—that is, the reproduction right, *id.* § 106(1).

The statute's <u>anti-trafficking</u> provisions prohibit the manufacture or sale of "any technology, product, service, device, component, or part thereof" that is "primarily designed or produced for the purpose of circumventing" either access controls, *see id.* § 1201(a)(2), or copy controls, *see id.* § 1201(b)(1). The statute also

prohibits the <u>act of circumventing</u> access controls. *Id.* § 1201(a)(1)(A). But the statute does not prohibit the circumvention of copy controls.

The Copyright Office has summarized the resulting statutory structure using the table reproduced as Figure 1 below:

| 17 U.S.C. § 1201 | Circumvention Prohibition? | Trafficking Prohibition? |
|---|---|---|
| **Access Controls** | Yes § 1201(a)(1) | Yes § 1201(a)(2) |
| **Copy Controls** | No | Yes § 1201(b) |

USCO 2017 DMCA Report at 7.

Congress adopted this asymmetrical framework for a very specific reason. When proposals for an anti-circumvention bill first came before Congress in 1995, the bill initially prohibited trafficking in devices designed to circumvent technological measures that "inhibit[] the violation[] of any of the exclusive rights" protected by copyright. NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. § 1201 (1995). Legacy media industries (including the Recording Industry of America ("RIAA")) wanted to go even further, and lobbied for a sweeping prohibition on the <u>act</u> of circumventing any technological measure designed to

protect against copyright infringement.[8]  But technology industry representatives

and others noted that a broad prohibition would "impede 'legal' copying."[9]  As one

group explained, it is well established that the public "in some instances may make

copies of [a] work without infringing the copyright," including by making fair use

of the content without the permission of the rightsholder.[10]  Prohibiting

circumvention of controls designed to preclude unauthorized reproductions would,

in effect, prohibit activity that the fair-use doctrine explicitly authorizes.

So Congress endorsed the "compromise" outlined above, *see* Litman, *supra*,

at 133–34, under which the statute would distinguish between access controls and

copy controls and ensure that circumvention of the latter would not violate the new

provision, *see* H.R. 2281, 105th Cong. § 1201 (1997).  By 1997, legacy media

---

[8] *See, e.g.*, NII Copyright Protection Act of 1995: Hearing before Subcomm. On Courts and Intell. Prop., pt. 2 at 380, 104th Cong. 380 (1996) (hereinafter "1996 Hearings") (Viacom: "Congress should make clear that the actual circumvention" of "anti-copying technologies" "is illegal" (emphasis in original)); *id.* at 494 (Coalition including RIAA suggesting that bill could be "improve[d]" by "making criminal penalties available" for "use of protection-defeating technology" (emphasis added)); *see also* Jessica D. Litman, *Digital Copyright* 131 (Ch. 9) (2d ed. 2006), available at https://repository.law.umich.edu/books/1/.

[9] *See, e.g.*, 1996 Hearings at 149 (statement of IEEE-USA); *see also id.* at 83, 432 (tech coalitions arguing that Congress must "protect the customary and reasonable fair use rights of consumers" and that "any 'anti-circumvention' provision must be carefully drafted so as not to prevent legitimate activities"); *see also* Litman, *supra*, at 132 (industry groups argued that "[i]f the reason a person circumvented a copy protection measure was to make fair use of the protected work, then that circumvention should itself be legal").

[10] 1996 Hearings at 543 (American Committee for Interoperable Systems).

groups had backed off their initial positions and threw their support behind the compromise. *See* 1997 Hearings at 203 (RIAA CEO "fully endors[ing]" the compromise bill, even though "[m]ost in the record industry feel strongly that these provisions should have gone further").

The proffered justification for this compromise was straightforward. Any copyright owner has the baseline right to decide when and how to make her work accessible to the public—e.g., whether to keep a new book under "lock and key," whether to "show it to others selectively," or whether to make it freely available for public access. 1997 Hearings at 49 (testimony of Marybeth Peters, Register of Copyrights). Access controls are one way copyright owners implement those decisions; prohibiting their circumvention is in a sense nothing more than a way to "back[]" the choice to withhold access "with legal sanctions." *Corley*, 273 F.3d at 435. As the Copyright Office explained shortly after the DMCA's passage: "since the fair use doctrine is not a defense to the act of gaining unauthorized access to a work, the act of circumventing a technological measure in order to gain access" can be "prohibited" without jeopardizing fair use. USCO 1998 DMCA Summary at 4.

But once a copyright owner decides to make a work accessible to the public, the question whether someone can copy it depends not on the copyright owner's preference, but rather on the contours of the Copyright Act—including the doctrine of fair use. 17 U.S.C. § 107; *see also U.S. v. Elcom Ltd.*, 203 F. Supp. 2d 1111, 1121

(N.D. Cal. 2002) ("once a published copy is sold," fair use "allow[s] a certain amount of direct copying for certain uses, without the permission of the copyright owner").  Copyright holders and the platforms that host their works are free to engage in self-help by implementing measures to prevent that copying as a technical matter—i.e., copy controls.  And Congress gave that self-help a limited degree of statutory fortification by prohibiting trafficking in tools that would allow others to circumvent copy controls.  17 U.S.C. § 1201(b)(1).

But making copy controls effectively impregnable by prohibiting their circumvention outright would have amounted to a strict legal prohibition on copying that fair use explicitly authorizes—particularly of works that are accessible only or primarily in digital formats.  Instead, "Congress expressly disclaimed any intent to impair any person's rights of fair use." *Elcom*, 203 F. Supp. 2d at 1120–21 (citing 17 U.S.C. § 1201(c)(1)).  This is why the statute, as enacted, does not prohibit the circumvention of "technological measures" that "do[] nothing to prevent access to the plain text of the work, but [are] designed to prevent that work from being copied."  USCO 2017 DMCA Report at 13 (citing Senate Judiciary Committee Report at 12).

The resulting statutory framework includes only a narrow prohibition on circumvention of access controls: *i.e.*, circumvention "to gain unauthorized access to a work." H.R. Rep. No. 105-551, pt. 1, at 18 (1998) ("House Judiciary Committee

Report").  That prohibition is limited so that it does not apply unless the circumvented measure stands as a barrier to the public's enjoyment of a work by, e.g., "encrypt[ing]" it so that no one can "gain access to" it without "the authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(B).  And that prohibition "does not apply to the subsequent acts of a person once he or she has obtained authorized access to a copy of a work protected under Title 17, even if such actions involve circumvention of additional forms of technological protection measures" like copy controls.  House Judiciary Committee Report at 18.

### B. The District Court Misconstrued the Statute

Neither the distinction between access controls and copy controls nor the precise boundary between those two distinct categories is of dispositive importance in this case.  Yout was accused of violating (and sought a declaratory judgment regarding) the DMCA's anti-trafficking provisions, which apply equally to access controls and copy controls.  *See* JA27 (accusing Yout of "provid[ing] access to a service (and/or software) that circumvents"); 17 U.S.C. § 1201(a)(2) (prohibiting access control circumvention devices); *id.* § 1201(b)(1) (same, for copy control circumvention devices).  Yout's liability thus does not turn on whether the YouTube technical measures at issue were access controls or copy controls.

But the access-control/copy-control distinction is of paramount importance to countless putative fair users of copyrighted material (including Amici) who wish to

make fair uses of publicly accessible material. The district court overlooked that distinction—and the statutory framework as a whole—by concluding that Yout had waived any argument relating to section 1201's copy-control provision. JA274 n.14. For that reason, the court did not analyze the statute's copy-control provision at all. It did not consider whether YouTube's download-prevention mechanism is more appropriately governed by that provision rather than the access-control provision. Nor did it attempt to interpret the statute's access-control provision in light of the parallel (but distinct) provision governing copy controls.

Instead, the court focused exclusively on whether YouTube's download-prevention mechanism meets its blinkered definition of an access control under 17 U.S.C. § 1201(a). In so doing, the district court acknowledged that the videos on YouTube platform are available "to stream" without restriction. JA254. But the court went on to analyze the workings of YouTube's download-prevention mechanism and found that, while YouTube's platform does offer a "downloadable file," one must carry out a series of steps to "access" that file. JA256–59. For that reason, the court concluded that "YouTube has some sort of access control in place." JA225.

That mode of analysis would collapse the distinction between access controls and copy controls. Consider, for example, a mechanism designed to "prevent[] the copying of an e-book after it has been downloaded to a user's device"—which the

Copyright Office describes as a paradigmatic copy control. *See* USCO 2017 DMCA Report at 6. Under the district court's analysis, that mechanism could just as easily be described as a mechanism to "control access to" the copy-protected book file stored inside an e-book device. Similarly, a mechanism designed to prevent the copying of audio tapes, *see supra* 8 (describing another paradigmatic copy control), could be described as a mechanism to "control access to" the sounds stored on the tape itself to prevent them from being copied. In fact, <u>any</u> copy control could be interpreted as an access control in some form or another. But that understanding of the statutory text would convert copy controls from a separate statutory category, *see* 17 U.S.C. § 1201(b)(1)(A), into a mere subset of access controls, *see id.* § 1201(a)(1). And if all copy controls were also access controls, section 1201(a) would necessarily prohibit their circumvention. That would effectively reverse Congress's decision to carve out copy controls from the statute's act-of-circumvention prohibition. *See supra* Part A.

The district court, in other words, focused on the meaning of the word "access," *see, e.g.*, JA250–51, while largely ignoring the overall statutory context in which that term is used.[11] But "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place

---

[11] The cause of this oversight was, most likely, the district court's decision to focus exclusively on section 1201(a) due to its finding that Yout had waived any arguments under section 1201(b). *See supra* 13–14 (citing JA274 n.14).

in the overall statutory scheme." *Nat'l Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007). Here, the word "access" in 17 U.S.C. § 1201(a) must be read in light of the fact that Congress defined a separate category of copy controls that must be given independent meaning.[12] Put simply, it cannot be the case that a "technological measure" that exists for the sole purpose of preventing copying is an access control just because it can fairly be characterized as controlling access to (e.g.) a file or server location. *Contra* JA257–58.

Instead, the statutory framework as a whole suggests that the question whether a technological measure is an access control depends on the measure's function in relation to the "work." 17 U.S.C. § 1201(a)(1)(A) (access controls "control[] access to <u>a work</u> protected under this title" (emphasis added)). A "work," in this context, means essentially the <u>content itself</u>—i.e., the "plain text" of a book, *see* Senate Judiciary Committee Report at 12, or the "audiovisual" material or "sound recordings" contained in the video files that YouTube makes available for free public

---

[12] *See United States v. Johnson*, 961 F.3d 181, 188 (2d Cir. 2020) (court must "give effect, if possible, to every clause and word of a statute," and [] must therefore try to "avoid statutory interpretations that render provisions superfluous" (cleaned up)); *RSD Leasing, Inc. v. Navistar Int'l Corp.*, 81 F.4th 153, 162 (2d Cir. 2023) (declining to read terms as "functionally synonymous" where doing so would "render redundant" legislature's "pointed variation in its selection of terms").

streaming, *see* 17 U.S.C. § 102(a).[13]  Measures that "control[] access to a work" must prevent the public from viewing that content without the "authority of the copyright owner."  17 U.S.C. § 1201(a)(3)(B).

If, on the other hand, a technological protection measure "does nothing to prevent access to the plain text [or other expressive content] of the work, but is designed to prevent the work from being copied," then it is a copy control and is not governed by the statute's access control provision.  Senate Judiciary Committee Report at 12; *see also Corley*, 273 F.3d at 441 (measures that "permit access" to a work but "prevent copying" of it are copy controls, not access controls).  And the fact that such technological measures might accomplish that copy prevention by controlling access to something <u>other than</u> the content of a work (e.g., a "downloadable file" containing that work) does not convert that measure into an access control.

Here, neither party disputed that anyone with an Internet connection can view the <u>content</u> of YouTube videos on the platform for free and without a login.  *See* JA12, 76-77.  And even the RIAA admitted, in its pre-litigation notices, that the singular purpose of YouTube's mechanism is to "protect[] [its] members' works on

---

[13] *See London-Sire Recs., Inc. v. Doe 1*, 542 F. Supp. 2d 153, 171 (D. Mass. 2008) (Congress "distinguish[ed] between the abstract, original work on the one hand, which is the source of the copyrights, and its material incarnation on the other").

YouTube <u>from unauthorized copying/downloading</u>."   JA27, 29, 31 (emphasis added).   That means the download-protection mechanism is a "technolog[y] designed to *permit access* to a work but *prevent copying* of the work."  *Corley*, 273 F.3d at 441.  And because it is a "technological measure that prevents copying," it is a copy control, and nothing in section 1201 prevents its circumvention.  USCO 1998 DMCA Summary at 4.

* * *

While not dispositive for this appeal, the distinction between access controls and copy controls is central to Congress's deliberate attempt to fashion section 1201 so that the statute does not interfere with fair uses.  While the district court's failure to analyze that distinction was inadvertent, the reasoning of its opinion—including its overbroad interpretation of the scope of access controls under 17 U.S.C. § 1201(a)(1)—threatens to upend the statutory framework Congress enacted.  That reasoning has already supplied the basis for assertions of section 1201 claims against defendants like Amici who have done nothing more than download publicly accessible works to make fair uses of them.  *See supra* note 7.  If endorsed by this Court, that reasoning will no doubt lead to even more aggressive assertions of this statutory provision by copyright holders who seek to use it to curtail fair uses of their works.  That, in turn, threatens to deprive the public of the benefit of these fair uses. *See Berlin v. E.C. Publications, Inc.*, 329 F.2d 541, 543–44 (2d Cir. 1964) (fair use

"subordinate[s] the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry").

This is the opposite of what Congress intended. This Court should correct that error and give effect to the statute Congress enacted.

Dated: October 7, 2025        Respectfully submitted,

LATHAM & WATKINS LLP

/s/ *Luke Ali Budiardjo*
Luke Ali Budiardjo
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

Andrew M. Gass
Brittany N. Lovejoy
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

Sarang V. Damle
Ruth Hirsch
555 11th Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-3317
Facsimile: (202) 637-2201

*Counsel for Amici Curiae Suno, Inc. and*
*Uncharted Labs, Inc., d/b/a Udio.com*

## <u>CERTIFICATE OF COMPLIANCE WITH RULES 32(a) AND 29</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29 because this brief contains 4,456 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.

Dated: October 7, 2025        <u>s/ *Luke Ali Budiardjo*</u>
                                       Luke Ali Budiardjo

## CERTIFICATE OF SERVICE

I, Luke Ali Budiardjo, hereby certify that I have this 7th day of October, 2025, electronically filed the foregoing Brief of Suno, Inc. and Uncharted Labs, Inc., d/b/a Udio.com as *Amicus Curiae* in Support of Plaintiff-Appellant with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. Participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

s/*Luke Ali Budiardjo*
Luke Ali Budiardjo