# 22-2760

## United States Court Of Appeals
## For The Second Circuit

---

**Yout LLC,**

*Plaintiff-Appellant,*

*vs.*

**Recording Industry of America, Inc.,**
*Defendant-Appellee.*

---

Appeal from United States District Court
District of Connecticut (New Haven)
Hon. Stefan R. Underhill
U.S. District Court Case No. 20cv1602

---

## Appellee's Response to Brief of *Amici Curiae* Suno, Inc. and Uncharted Labs, Inc.

---

Glenn D. Pomerantz
\* Rose Leda Ehler
Shannon Aminirad
Munger, Tolles & Olson LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
(213) 683-9100

Attorneys for Recording Industry of America, Inc.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................1

STATUTORY TEXT................................................................................3

ARGUMENT..........................................................................................5

I.    AMICI'S PROPOSED READING OF SECTION 1201(a) CANNOT BE SQUARED WITH THE COPYRIGHT ACT'S PLAIN LANGUAGE ..............................................................................5

    A.    Section 1201(a) Does Not Require That An Access-Control Measure "Prevents" Access To A Copyrighted Work, Only That Such A Measure "Controls" Access To It ...................................5

    B.    Section 1201(a) Applies To Technology That Controls Access To *Works*, Not Just *Performances* Of Works (Such As "Viewing Content") ..........................................................................8

    C.    The Fact That Some Technological Measures May Function As Both Access And Copy Controls Does Not Collapse Sections 1201(a) And 1201(b) .....................................................................11

II.    THE LEGISLATIVE HISTORY SUPPORTS THE PLAIN TEXT READING AND DISTRICT COURT'S APPLICATION OF SECTION 1201 .......................................................................14

    A.    Amici Neglect That The Purpose Of Section 1201 Was To Encourage Copyright Owners To Distribute Their Works Online ...............................................................................14

    B.    The DMCA Already Accommodates Fair Use ..................................17

III.    AMICI'S CONCERNS CANNOT OVERRIDE THE STATUTE ..............19

CONCLUSION ....................................................................................20

# TABLE OF AUTHORITIES

                                                                    Page(s)

**FEDERAL CASES**

*All. of Artists & Recording Cos., Inc. v. General Motors Co.*,
    162 F. Supp. 3d 8 (D.D.C. 2016) ....................................................10

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017)....................................................12, 13

*Green v. United States Dep't of Justice*,
    111 F.4th 81 (D.C. Cir. 2024) ...........................................16, 19, 20

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010)........................................................12

*RealNetworks, Inc. v. Streambox, Inc.*,
    No. 2:99-cv-02070, 2000 WL 127311 (W.D. Wash. Jan. 18, 2000)................13

*United States v. Elcom, Ltd.*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002)....................................14, 15

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)............................................3, 5, 15, 20

*Universal City Studios, Inc. v. Reimerdes*,
    111 F. Supp. 2d 294 (S.D.N.Y. 2000) ........................................6, 11

**FEDERAL STATUTES**

17 U.S.C. § 101 ................................................................................9

17 U.S.C. § 102(a) ..........................................................................9

17 U.S.C. § 106 ............................................................................13

17 U.S.C. § 1201............................................................................1, passim

Audio Home Recording Act of 1992....................................................10

**LEGISLATIVE MATERIALS**

H.R. Comm. Print No. 105-6 (1998) ......................................11, 16, 17

H. Rep. No. 105-551 (1998)............................................................15, 18

S. Rep. No. 105-190 (1998) .........................................5, 11, 15, 18, 19

WIPO Copyright Treaties Implementation Act and Online Copyright
    Liability Limitation Act: Hearing before the Subcomm. on Courts
    and Intellectual Property of the H. Comm. on the Judiciary, 105th
    Cong. ...........................................................................................6, 7

**OTHER AUTHORITIES**

U.S. Copyright Office, Section 1201 of Title 17: A Report of the
    Register of Copyrights (June 2017)......................................15, 16, 18

## INTRODUCTION

Amici Suno, Inc. and Uncharted Labs, Inc. deride the district court for adopting a "blinkered" reading of section 1201. Br. at 6, 14. In fact, it is Amici who ignore section 1201's plain language. The reading Amici propose would gut copyright owners' ability to control access to their works online and thereby undermine Congress's core purpose in enacting section 1201 of the Digital Millenium Copyright Act (DMCA).

Amici argue that a technological measure qualifies as an "access control" *only* if it "*prevent[s]* the public *from viewing that content*." Br. at 17 (emphasis added). But section 1201(a) does not say that. The statute instead applies broadly to any technological measure that "*effectively controls* access to a *work*." 17 U.S.C. § 1201(a)(1)(A) (emphasis added). A measure controls access "*effectively*," and therefore is subject to the statutory protections against circumvention, if, "*in the ordinary course of its operation*, [the measure] requires the application of information, or a process or a treatment, with the authority of the copyright owner, *to gain access to the work*." *Id*. § 1201(a)(3)(B) (emphasis added).

Amici's proposed re-writing of the statute suffers from two fundamental flaws. First, "*control*" does not mean "*prevent*." 17 U.S.C. § 1201(a)(1)(A); Br. at 17. Second, "gain[ing] access to the *work*" is not the same as "*viewing content*," which is a performance of the work. 17 U.S.C. § 1201(a)(3)(B); Br. at 17

1

(emphasis added).  Congress chose broader language that encompasses technologies regulating *how* and *under what conditions* access occurs, not just those measures that block access entirely.

In this case, Yout's pleadings make clear that "in the ordinary course" YouTube's "signature mechanism" allows a user to "initiate the video stream"— but that process does not grant access to the underlying sound recording.  *Id*. § 1201(a)(3)(B); JA-57–58 (SAC ¶ 98).  Yout's technology "bypasses" the ordinary course process through "modif[ying]" the "Request URL," which enables Yout to access the fixed work itself.  *Id*. § 1201(a)(3)(A); JA-47–49 (SAC ¶¶ 68– 70).  The district court correctly concluded that this is circumvention of an access-control measure under the definitions in 1201(a).

Amici insist that their proposed reading of the statute is necessary to vindicate Congress's statutorily unexpressed intent to provide a wide berth for parties, like Amici, who invoke fair use to justify the act of copying the work. Amici ignore that the DMCA expressly sets forth Congress's framework for balancing section 1201's anti-circumvention provisions and fair use.  Congress created exemptions as well as an administrative process for recognizing other exemptions through a triennial "noninfringing use" rulemaking proceeding.  17 U.S.C. § 1201(a)(1)(C)–(D) (rulemaking); *id.* § 1201(d)–(j) (exemptions); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 444 n.13 (2d Cir. 2001)

(explaining Congress "balanced" fair use "principally" through the "fail-safe" rulemaking proceedings and created "breathing space for fair use" through statutory exemptions).

Amici are free to participate in the Copyright Office's triennial rulemaking proceedings. And, Amici have already presented, at the pleading stage, the arguments they make here to the district courts in their cases. Amici will have further opportunity in discovery to develop a factual record showing how they accessed and acquired the copyrighted works used to train their AI models; what technological measures they encountered; and how those measures functioned to control access to the works at issue. The district courts in those cases will be able to determine, on the basis of the fully developed record, whether Amici engaged in prohibited circumvention. Amici do not supply this Court with any evidence about what they do and how they do it. And Amici, like Yout, provide no basis for reversing the district court's carefully reasoned and correct judgment.

## STATUTORY TEXT

Section 1201(a) provides in pertinent part:

**1201(a) Violations regarding circumvention of technological measures.**—(1)(A) No person shall circumvent a technological measure that effectively controls access to a work protected under this title . . . .

*[1201(a)(1)(B)–(E) set forth the "noninfringing use" rulemaking proceedings.[1]]*

(2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

    (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

    (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

    (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

(3) As used in this subsection—

    (A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

    (B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

17 U.S.C. § 1201(a).

---

[1] For space, RIAA does not include the text of sub-sections 1201(a)(1)(B)–(E), but the structure of including these provisions directly after the prohibitions of section 1201(a)(1)(A) makes plain Congress's intent that this framework accommodates noninfringing uses.

# ARGUMENT

## I. AMICI'S PROPOSED READING OF SECTION 1201(a) CANNOT BE SQUARED WITH THE COPYRIGHT ACT'S PLAIN LANGUAGE

### A. Section 1201(a) Does Not Require That An Access-Control Measure "Prevents" Access To A Copyrighted Work, Only That Such A Measure "Controls" Access To It

Amici argue that a technological measure qualifies as an "access control" under section 1201(a) only if it "prevents" access to the work. Br. at 6, 17.[2] That is wrong as a straightforward matter of statutory interpretation. It also ignores Yout's allegations at issue in this case.

First, section 1201(a) does not use the word "prevents." It uses the word "controls." The statute means what it says. The district court was correct to reason that the plain meaning of "controls access" is a measure that functions to limit or "restrain[] a user's freedom or ability to access" a work. JA-254, *see also* JA-250–51, JA-258–59.

Second, the district court correctly construed what constitutes an access-control "technological measure" in accordance with the statute's flexible definition

---

[2] Amici's citations do not change the statutory language. Amici cite *Corley,* 273 F.3d at 441, and the Senate Judiciary Committee Report No. 105-190 at 12 (1998), which use the word "prevent." But neither source concludes that "controls" means *only* "prevents" in the sense Amici argue, such that by offering streamed performances, copyright owners forfeit protection for their works under 1201(a). In fact, both *Corley* and the Senate Judiciary Committee Report make clear that Congress intended for the statute to provide broad protection to copyrighted works. *Corley*, 273 F.3d at 435; S. Rep. No. 105-190, at 8.

of what it means for a measure to "effectively control access to a work."  *See* JA-251–52, 262–63.  The measure, "in the ordinary course," need only "require[] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."  17 U.S.C. § 1201(a)(3)(B).  An access control can be a password, activation and validation keys, "secret handshake" protocol, or "CAPTCHA" technology.  *See* JA-264 (collecting cases).  The measure is effective as long as its "*function* is to control access."  *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 318 (S.D.N.Y. 2000) (emphasis added).  It also need not be a "strong means of protection" to serve that function.  *Id.*; *see* JA-264–65 (collecting cases regarding same).

Third, the district court's reading of the statute is in accord with the legislative history.  Amici cite portions of the then-Register's (Marybeth Peters) testimony.  Br. at 11.  But Amici ignore other parts of the Register's testimony.  She explained that safeguarding access measures vindicated copyright owners' longstanding ability to control access to their works, meaning to control the conditions governing access to their works:

> It has long been accepted in U.S. law that the copyright owner has the right to control access to his work, and may choose not to make it available to others *or to do so only on set terms*.  This means not only that a copyright owner may keep a work forever unpublished, but also that he can publish it while *controlling the conditions under which others are allowed to see it* such as charging a fee or *imposing restrictions on how the work may be used*. . . . *The bill would*

6

> *continue this basic premise*, allowing the copyright owner to keep a
> work under lock and key *and to show it to others selectively*. . . .

WIPO Copyright Treaties Implementation Act and Online Copyright Liability

Limitation Act: Hearing before the Subcomm. on Courts and Intellectual Property

of the H. Comm. on the Judiciary, 105th Cong. 46–47, 49 (1997) (statement of

Marybeth Peters, Register of Copyrights, U.S. Copyright Office) (emphasis

added).[3]  The access-control provisions of section 1201 are legal protections for

the technological measures that copyright owners use online to "control[] the

conditions under which others are allowed to see it." *Id.*  Nothing dictates that

access-control measures serve only to block access.

Fourth, in this case, Yout's own allegations, which Amici ignore, established

that YouTube's rolling cipher mechanism maintains control over consumers'

ability to access the work and limits that access to ad-supported streaming via the

YouTube.  The YouTube service streams content to users using "any HTTP user

agent," including a web browser or user-side software, that has a "Javascript

interpreter."  JA-43, 57–58 (SAC at ¶¶ 58, 98).  When the HTTP user agent

"encounters" YouTube's "signature mechanism," the user agent: "reads and

interprets the JavaScript program sent by YouTube"; "derives a signature value";

and "sends that value back to YouTube to initiate the video stream."  JA-57–58

---

[3] *Available at* https://www.copyright.gov/docs/2180_stat.html.

(SAC ¶ 98). YouTube's process thereby controls access by limiting it to ad-supported streaming. Yout expressly alleges that it must "modif[y]," the "signature value" to gain access to the underlying work. JA-48–49 (SAC ¶¶ 69–70). The district court carefully parsed and analyzed precisely these allegations in concluding that Yout could not state a claim for avoiding section 1201(a)'s anti-circumvention provisions. JA-237, JA-257–59, JA-265.

**B.** **Section 1201(a) Applies To Technology That Controls Access To *Works*, Not Just *Performances* Of Works (Such As "Viewing Content")**

Amici further misread the statute by arguing that "[m]easures that 'control[] access to a work' must prevent the *public* from *viewing that content*." Br. at 17. The phrase "viewing that content" describes a *performance* of a work—such as the streamed performance of a music video on YouTube. Amici's argument conflates access to a "performance" of a work with access to the "work" itself. That argument is inconsistent with the text and it narrows the plain language.

The Copyright Act carefully defines and distinguishes between a "performance" of a work and the "work" that is performed. "To 'perform' a work means to 'recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.'" 17 U.S.C. § 101. The "work" is the copyrighted material, which is then contained

in "fixed" form, such as a video or audio file. 17 U.S.C. § 102(a). Amici's theory would, without any statutory support, narrow section 1201(a) to only those technological measures that gate public-facing streams or displays, like a password wall, while excluding measures that control access to a work in fixed form.

Section 1201 prohibits circumvention of any technological measure that "effectively controls access to a *work*" and functions in connection with "gain[ing] access to the *work*." 17 U.S.C. §§ 1201(a)(1)(A), (3)(B) (emphasis added). The statute does not limit itself to "viewing," "listening," or "public"[4] access as Amici suggests, Br. at 6, 17; nor does the statute say anything about excluding measures that control access to fixed copies of the work. To the contrary, the statute applies to *all forms* of access to the work. This includes works that YouTube stores as fixed digital copies—precisely what Yout accesses. JA-41 (SAC ¶ 43); JA-47–49 (SAC ¶¶ 68–70).

This distinction matters here. Amici and Yout would want this Court to believe the access at issue here is to the streamed performance of a work. It is not. Yout enables access to the underlying fixed copy of the work. According to Yout's complaint: its service identifies the "Request URLs" and then "modif[ies]"

---

[4] Sections 1201(a)(2) and 1201(b)(1) use the word "public" for a different purpose: to describe the ban on trafficking in circumvention technology that is "offer[ed] to the public."

the "'range=' sequence" (i.e., the "signature value") to access and then download the digital file copy of the work. JA-45–51 (SAC ¶¶ 65–73); *see* JA-256–58 (district court's explanation of the same). Yout also makes clear the digital file it copies is the one on YouTube's servers, when it says it "originates" from YouTube's "source url[s]." JA-41 (SAC ¶ 43). That circumvention falls squarely within the protections of section 1201(a).

Finally, Amici's description of technologies that they say involve "quintessential" copy controls only underscore the flawed reasoning. Amici identify (1) "preventing the copying of an e-book after it has been downloaded to a user's device" and (2) "a system that prohibits the subsequent copying of an audio tape." Br. at 7–8. In both examples, the user already possesses the fixed copy: an e-book downloaded to a device, or an audio tape copy. Further, in at least one of those examples, the technological measures function only in connection with the *copying process* from the audio tape, but do not function when someone tries to play a performance of the work.[5]

---

[5] *Alliance of Artists and Recording Companies, Inc. v. General Motors Company*, 162 F. Supp. 3d 8 (D.D.C. 2016), which Amici cite, arose under the Audio Home Recording Act of 1992 ("AHRA"), not the DMCA. The AHRA required manufacturers of certain recording devices to employ the "Serial Copy Management System," which limited consumers from making serial copies. As the graphic in the opinion makes clear, the technology functioned only in connection with someone making a copy of a sound recording. *Id.* at 12.

**C.    The Fact That Some Technological Measures May Function As Both Access And Copy Controls Does Not Collapse Sections 1201(a) And 1201(b)**

Amici are wrong that interpreting section 1201(a) according to its plain text "collapses" the "distinction between access controls and copy controls."  Br. at 13–14.  As the district court correctly held, section 1201(a) applies when a technological measure controls how a user gains access to a work.  *See* Section I.A, *supra*.  Section 1201(b), in turn, applies where a technological measure limits or prevents copying a work (or exploiting another exclusive right).  S. Rep. No. 105-190, at 12; *Reimerdes*, 111 F. Supp. 2d at 318 ("technological measure 'effectively controls access' to a copyrighted work if its *function* is to control access") (emphasis in original) (citing House Comm. Print No. 105-6, Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 10 (1998) ("H.R. 2281 Section-by-Section Analysis")).

The two subsections govern technology that *functions* at different points to protect the works.  A technological measure may be (1) only an "access control," like a password, that functions when someone seeks to "gain access to the work," *see* 17 U.S.C. § 1201(a)(3)(A); (2) only a "copy control," like the e-book and audio tape controls Amici cite, that functions when someone who has obtained authorized access to a fixed copy of the work tries to copy it, *see id.* § 1201(b)(2)(A); or (3) both an access control and copy control.

Amici wish away that technologies *can* be both. They omit any discussion of well-reasoned Ninth Circuit cases that squarely hold "if a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement," liability can arise under both subsections. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 946 (9th Cir. 2010).

*Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), is instructive. That case involved a defendant, VidAngel, that, like Amici, faced claims for circumvention under section 1201(a)(1) (rather than trafficking in circumvention technology). VidAngel purchased DVDs and Blu-ray discs and used decryption software to strip the encryption for purposes of copying the movies to its own servers. *Id.* at 853. VidAngel defended its conduct by arguing that the DVD encryption systems were "use controls" (what Amici refer to as "copy controls") rather than "access controls." *Id.* at 863–64. VidAngel claimed the section 1201 claim in that case was based on "decryption to copy—a *use* of the copyrighted work" and that the technological measures in that case were "'conditional access controls [that] should be treated as use controls' governed by [section] 1201(b)." *Id.* (emphasis in original). VidAngel argued it could not be liable under section 1201(a)(1) for unlawful circumvention because it was engaged in using (copying) the works, and thus its conduct could only be proscribed as copyright infringement.

12

The Ninth Circuit rejected VidAngel's argument. It held that "the statute does not provide that a [measure] cannot serve as both an access control and a use control," and that the statutory "text does not suggest that a defendant could not violate both section 1201(a)(1)(A), by circumventing an access control measure, and section 106, by, for example, reproducing or publicly performing the accessed work." *VidAngel*, 869 F.3d at 864. While "unlawful circumvention under [section] 1201(a) . . . [are] acts that do not necessarily infringe or facilitate infringement," a defendant who "decrypts the [technological protection measures] and then reproduces that work[] is liable for *both* circumvention in violation of [section] 1201(a)(1)(A) and copyright infringement in violation of [section] 106(1)." *Id.* (emphasis added) (citation omitted).

*VidAngel* cannot be distinguished on the ground that it involved the technological measure of Content Scramble System (CSS) encryption on DVDs. Yout's allegations establish that YouTube's "signature mechanism" has, at a minimum, the same function as CSS of restricting access to the copyrighted work. One must decrypt encryption on a DVD to access the file of a work stored on a DVD for playback. *VidAngel*, 869 F.3d at 853. So too here, users "encounter" the YouTube "signature mechanism" to "initiate the stream." JA-57 (SAC ¶ 98). This is akin to CSS. It is the "Secret Handshake" that YouTube uses, just like CSS recognizes an authorized DVD player. *RealNetworks, Inc. v. Streambox, Inc.*, No.

13

2:99-cv-02070, 2000 WL 127311, at *7 (W.D. Wash. Jan. 18, 2000). The

signature mechanism controls access because, as Yout expressly alleges, the Yout

technology utilizes a process to bypass the signature mechanism by, among other

steps, "*modif[ying]*" the range of numbers in the "signature value" to gain access

to the computer file that contains a copy of the copyrighted work. JA-48–49, 50–

52, 57 (SAC ¶¶ 69–70, 72–74, 98) (emphasis added).

Like CSS on DVDs, YouTube's signature mechanism functions at the access

point—regulating whether and how a user may reach the underlying work. As

Amici suggest, it may also function as a "copy control" to prevent downloading,

Br. at 4, but that dual functionality does not alter the proper reading of the statute.

## II. THE LEGISLATIVE HISTORY SUPPORTS THE PLAIN TEXT READING AND DISTRICT COURT'S APPLICATION OF SECTION 1201

### A. Amici Neglect That The Purpose Of Section 1201 Was To Encourage Copyright Owners To Distribute Their Works Online

Amici take the bold position that "once a copyright owner decides to make a

work accessible to the public," the protections afforded by section 1201 must yield

to fair use. Br. at 11–12. Amici's gloss on section 1201 is not supported.

As an initial matter, the case Amici cite, *United States v. Elcom, Ltd.*, was a

criminal case *denying* the defendant's motion to dismiss the criminal DMCA

indictment. 203 F. Supp. 2d 1111 (N.D. Cal. 2002). More important, the court in

that case recognized the crucial point that Amici neglect: "Congress was

concerned with promoting electronic commerce while protecting the rights of copyright owners, particularly in the digital age where near exact copies of protected works can be made at virtually no cost and distributed instantaneously on a worldwide basis." *Id.* at 1124. This Court recognized the same goal motivated passage of section 1201:

> Fearful that the ease with which pirates could copy and distribute a copyrightable work in digital form was overwhelming the capacity of conventional copyright enforcement to find and enjoin unlawfully copied material, Congress sought to combat copyright piracy in its earlier stages, before the work was even copied.

*Corley*, 273 F.3d at 435; *see also* S. Rep. No. 105-190, at 8 (explaining that the DMCA "create[s] the legal platform for launching the global digital on-line marketplace for copyrighted works" and "facilitate[s] making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius"); H.R. Rep. No. 105-551(I), at 9 (1998) (the DMCA was "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet").

The DMCA has served that goal well through an intentionally flexible approach, focused on the function of the technology, and not specific methods or business models. *See* S. Rep. No. 105-190, at 15 (anticipating "the rapid and dynamic development of better technologies"). "[L]egal protections afforded by section 1201 have played a critical role in [copyright owners'] decisions to enter

emerging digital markets." U.S. Copyright Office, Section 1201 of Title 17: A
Report of the Register of Copyrights at 36–37 (June 2017).[6] "The dramatic growth
of streaming services," including models like "ad-supported services," has helped
streaming "become a preferred method of delivering copyrighted content." *Id.* at
44–46.

Consumers today can stream music, movies, and other works (at no financial
cost to the user) on an online advertisement-supported service, like YouTube.
"[T]he statute has worked just as Congress intended, laying the legal foundation
for the explosion in legitimate digital dissemination models over the past two
decades." *Id.* at ii. This serves the goals of copyright: "If every work that the
public might wish to access 'could be pirated away' via circumvention, soon
nothing worth reading would be published electronically." *Green v. United States
Department of Justice*, 111 F.4th 81, 98 (D.C. Cir. 2024).

Amici's theory would strip DMCA protection from copyright owners who
choose to share performances of their works on YouTube, as well as other ad-
supported digital streaming and social media platforms. *See* H.R. 2281 Section-
by-Section Analysis at 6 (technological measures can "support new ways of
disseminating copyrighted materials to users, and . . . safeguard the availability of

---

[6] *Available at* https://www.copyright.gov/policy/1201/section-1201-full-report.pdf
(hereafter "Copyright Office Section 1201 Report").

legitimate uses of those materials by individuals").  That result could jeopardize the legal foundation on which today's streaming economy rests and, in practical terms, penalize copyright owners who rely on section 1201 to safeguard their works from mass piracy on platforms like YouTube.  The DMCA was designed to support innovation in digital distribution, not to expose creators to uncompensated exploitation of their works if they made those works available online in any manner.  The Court should therefore reject Amici's interpretation as inconsistent with both the text and the purpose of the DMCA.

### B.     The DMCA Already Accommodates Fair Use

Amici neglect completely that Congress *did* act to balance the new protections of section 1201 with fair use.  Congress did not do so through some implicit bargain that the same technological measure must be either an access- or copy-control measure.  Congress instead balanced fair use concerns *expressly*— through statutory provisions that Amici simply ignore.

In particular, section 1201(a)(1)(B)–(D) directs the Librarian of Congress to conduct a triennial rulemaking to exempt specific classes of works whose users may be "adversely affected . . . in their ability to make noninfringing uses." 17 U.S.C. § 1201(a)(1)(B)–(E).  In addition, sections 1201(d) through (j) codify numerous exemptions for particular uses, such as encryption research, security

testing, and reverse engineering. *Id.* § 1201(d)–(j). And Congress expressly preserved fair use in section 1201(c)(1).

Taken together, these provisions demonstrate that Congress already struck a careful balance—preserving fair use for lawfully acquired works while prohibiting the unauthorized circumvention of access controls. The history is not equivocal on this point. *See, e.g.*, H.R. Rep. No. 105-551(II), at 35–36 (1998) (discussing Congress's decision to protect fair use rights through certain exemptions and rulemaking); *see* Copyright Office Section 1201 Report at 102–04 (reiterating that the DMCA balanced fair use concerns through the triennial rulemaking proceedings, and rejecting calls for "exemption that would permit circumvention for any lawful or noninfringing use").

That is not to say that fair use was not discussed in connection with drafting 1201(a) and 1201(b). But that does not mean concerns over fair use were the driving force behind the asymmetrical structure that Amici identify. The history and final text support a straightforward explanation for the asymmetry: Congress understood that copyright law already prohibited unauthorized reproduction, so it saw no need to create a separate cause of action for circumvention of "copy controls." The Senate Report confirms as much:

> The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful. The device limitation in 1201(a)(2) enforces this new prohibition on conduct. The copyright law has long forbidden copyright

infringements, so no new prohibition was necessary. The device
limitation in 1201(b) enforces the longstanding prohibitions on
infringements.

S. Rep. No. 105-190, at 12. In other words, Congress declined to duplicate

existing infringement remedies.

## III. AMICI'S CONCERNS CANNOT OVERRIDE THE STATUTE

If Amici believe section 1201(a) chills their ability to fairly use copyrighted

works, their remedy lies with the triennial rulemaking proceeding, where the

Librarian may grant and has granted numerous class-specific exemptions. That

process, not judicial revision of clear statutory text, is the mechanism Congress

provided for addressing evolving technological uses. *See Green*, 111 F.4th at 100–

03 (explaining triennial rulemaking grants more certainty to fair users than

litigating the affirmative defense of fair use).

They can also make their arguments to the district courts in their cases,

unconstrained by Yout's pleadings and its inability to plausibly state a claim.

Amici already have at the pleading stage in their own cases.[7] And they may

continue to seek discovery in support of their arguments and re-raise them as

necessary on summary judgment. But Amici's interests do not justify the strained

---

[7] *See* Opposition to Motion to Amend, *UMG Recordings, Inc. v. Suno, Inc.*, No.
1:24-cv-11611-FDS (D. Mass. Oct. 3, 2025), Dkt. 131; *id.* Dkt. 157 (Sur-reply);
Motion to Dismiss, *UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 1:24-cv-
04777-AKH (S.D.N.Y. Oct. 10, 2025), Dkt. 125; *see also id.* Dkt. 133 (Reply).

interpretation of the statute that they press.  It is also not the case that "the ruling below jeopardizes the fair use doctrine" as Amici claim.  Br. at 1.  As this Court explained:

> We know of no authority for the proposition that fair use, as protected by the Copyright Act, much less the Constitution, guarantees copying by the optimum method or in the identical format of the original. . . . Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original.

*Corley*, 273 F.3d at 459; *see also Green*, 111 F.4th at 98 (similar).

There is no need to distort the statute to accommodate fair use concerns. The law Congress enacted already strikes the appropriate balance.

## CONCLUSION

For the foregoing reasons, the Court should decline Amici's invitation to rewrite section 1201 of the DMCA and affirm the district court's judgment.

Dated:  November 10, 2025

<div style="margin-left: 50%;">

_/s/ Rose Leda Ehler_

Glenn D. Pomerantz
*Rose Leda Ehler
Shannon Aminirad
Rose.Ehler@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
(213) 683-9100

_Attorneys for Recording Industry of America, Inc._

</div>

**CERTIFICATE OF COMPLIANCE**

This document complies with the page limit set by the Court's October 10, 2025 Order because this brief contains 20 pages.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.